**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **ACUMEN FINANCIAL ADVANTAGE, LLC** <br> 24586 CALLE SAN VICENTE <br> MURRIETA, CA 92562, <br><br> AND <br><br> **MODERN CAPITAL EXECUTIVE SOLUTIONS, INC.** <br> 791 E 3RD STREET UNIT 2 <br> BOSTON, MA 02127 <br><br> AND <br><br> **RYAN MILLMAN** <br> 791 EAST 3RD STREET #2 <br> BOSTON, MA 02127, <br><br> Plaintiffs, <br><br> vs. <br><br> **STEARNS FINANCIAL GROUP, LLC,** <br> **SFG EXECUTIVE BENEFITS, LLC** <br> 2368 VICTORY PKWY., STE. 410 <br> CINCINNATI, OH 45206, <br><br> <u>Serve also at:</u> <br><br> C/O NORTHWEST REGISTERED AGENT SERVICE, INC. <br> 30 N. GOULD ST., STE. N <br> SHERIDAN, WY 82801, <br><br> AND <br><br> **CAPAXA, LLC** | CASE NO. <br><br> JUDGE <br><br><br><br><br><br><br><br><br> JURY DEMAND |

| | |
|---|---|
| 2368 VICTORY PKWY., STE. 410 | ) |
| CINCINNATI, OH 45206, | ) |
| | ) |
| **Serve also at:** | ) |
| | ) |
| C/O NORTHWEST REGISTERED AGENT | ) |
| SERVICE, INC. | ) |
| 30 N. GOULD ST., STE. N | ) |
| SHERIDAN, WY 82801 | ) |
| | ) |
| AND | ) |
| | ) |
| **INFINEO HOLDINGS, INC.** | ) |
| c/o INCORPORATING SERVICES, LTD. | ) |
| 3500 SOUTH DUPONT HWY. | ) |
| DOVER, DE 19901 | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiffs Acumen Financial Advantage, LLC ("*Acumen*"), Ryan Millman ("*Millman*"), and Modern Capital Executive Solutions, Inc. ("*MCES*," and with Acumen and Millman, the "*Plaintiffs*") for their Complaint against Defendants Stearns Financial Group, LLC, ("*SFG*"), Infineo Holdings, Inc. ("*Infineo*"), and Capaxa, LLC ("*Capaxa*," and with Infineo and SFG, the "*Defendants*"), state as follows:

### INTRODUCTION

1. The Parties operate and conduct business in the financial services sector, in part, working with credit unions and other institutions to design, implement, and manage compensation-based executive benefits programs, including Supplemental Executive

2

Retention and Retirement Plans (SERPs) and Collateral Assignment Split Dollar (CASD) life insurance solutions, to attract and retain top executives.

2. Defendants promote their use of the LifeNotes Statutory Trust ("*LifeNotes*"), a special purpose vehicle, of which Capaxa is the Trustee and SFG administers, to convert existing split-dollar plans or purchase new ones within Capaxa and LifeNotes.

3. Millman's career focuses on designing and updating SERPs and CASD plans. At the relevant times herein, Millman performed this work with MCES.

4. In 2022, despite competing in the same industry, Defendants asked MCES—and later, in 2024, Acumen—to market the CASD/LifeNotes product to MCES's clients in exchange for a share of commissions.

5. At the outset of their business relationship, MCES, Millman, and Defendants executed (1) an August 8, 2022 Non-Disclosure Agreement (the "*2022 NDA*"), of which a true and accurate copy is attached as **Exhibit 1**, and (2) MCES and Defendants executed a February 1, 2023 Producer Agreement (the "*Producer Agreement*"), of which a true and accurate copy is attached as **Exhibit 2**.

6. In Q4 2022, pursuant to the Producer Agreement, MCES began marketing and selling SFG/Capaxa's products, including the LifeNotes CASD solution, either by converting existing plans or selling new ones.

7. SFG and Capaxa initially made the required quarterly payments, but stopped following its payment for the first quarter of 2025 without any basis, therefore breaching the Producer Agreement.

8. Upon information and belief, Eric Stearns ("*Stearns*") was the President and CEO of SFG, and, at all relevant times herein until January 15, 2026, was Infineo's CEO and President.

9. Infineo and SFG operate in a coordinated partnership, with Infineo publicly marketing SFG and Capaxa on its website[1] and offering complementary services. Their overlapping leadership and unified promotion of the LifeNotes platform demonstrate aligned commercial interests. Accordingly, the tortious conduct described herein was undertaken for the shared benefit of both Infineo and SFG.

10. Upon further information and belief, Jay Rogers ("*Rogers*") was SFG's Director of Business Development and Infineo's Co-Founder and Director, later becoming Infineo's CEO on or about January 15, 2026.

11. Yet, rather than resolve their breaches, Defendants now persistently, without merit, attempt to impose purported contractual restraints on Acumen, that never agreed to them, asserting a "non-solicit" provision that acts as an all-encompassing non-compete and confidentiality provision, restricting MCES and Millman from conducting business in a broadly defined "market," going far beyond any legitimate business interest. Defendants also ignore that Acumen executed a May 3, 2025 Confidentiality and Non-Disclosure Agreement (the "*2025 NDA*") that does not contain restrictions on whom Acumen may conduct business

---

[1] *See* Infineo's website, https://infineo.ai/team/.

4

with, undermining the necessity for the purported restrictions in the 2022 NDA.[2] A true and accurate copy of the 2025 NDA is attached as **Exhibit 3**.

12.     Because a ripe and justiciable controversy exists, for these reasons, which are fully detailed below, Plaintiffs request that the Court declare the following:

➢ Acumen is not a party to the 2022 NDA, and is thus not bound by its terms and provisions;

➢ Alternatively, should the Court determine Acumen is a party to the 2022 NDA, that (1) Section Four ("Non-Solicitation") is unenforceable and must be stricken and (2) Acumen did not breach the 2022 NDA's terms, including, but not limited to, Sections Three ("Non-Disclosure of Confidential Information") or Four ("Non-Solicitation");

➢ Acumen and Millman are not parties to the Producer Agreement, and are thus not bound by its terms and provisions;

➢ Alternatively, should the Court determine either Acumen or Millman is a party to the Producer Agreement, that they did not breach its terms, including, but not limited to, Sections Five ("Non-Disclosure of Confidential Information") or Six ("Non-Solicitation"); and

➢ That Acumen did not violate the May 2025 NDA, executed just before Defendants asserted their accusations against Plaintiffs.

13.     In addition to Defendants' contractual overreach, Defendants have engaged in a sustained pattern of disseminating false and disparaging statements about Plaintiffs to third parties, including Plaintiffs' business associates, referral partners, and potential and existing

---

[2] MCES and Millman commenced a separate arbitration with the American Arbitration Association under forum-selection clauses in the 2022 NDA and Producer Agreement.

credit union clients, asserting, without basis, that Plaintiffs engaged in misconduct, regulatory violations, fraud, and improper business practices.

14. Multiple partners and prospective clients reported learning of these accusations from Defendants, resulting in damaged business relationships, lost opportunities, and significant harm to Plaintiffs' reputation in the financial services and credit union sector.

15. As such, and for the reasons further detailed below, Plaintiffs seek damages for the substantial harm caused by Defendants' false statements and improper interference with Plaintiffs' present and future business relationships by asserting claims for intentional interference with business relationships and defamation.

**PARTIES**

16. Acumen is a limited liability company organized and existing under the laws of the State of Delaware and has principal places of business in Murrieta, California and Boston, Massachusetts. Acumen was co-founded by Scott Hinkle ("*Hinkle*") and Millman.

17. Millman is an individual residing in the State of Massachusetts.

18. MCES is a corporation organized and existing under the laws of the State of Massachusetts and has a principal place of business in Boston, Massachusetts.

19. Upon information and belief, Infineo is a corporation organized and existing under the laws of the State of Delaware.

6

20. Upon information and belief, SFG transacts business in Ohio as Stearns Financial Group, LLC and is a limited liability company organized and existing under the laws of the State of Wyoming under the name SFG Executive Benefits, LLC, with a principal place of business in Cincinnati, Ohio.

21. Upon information and belief, Capaxa is a limited liability company organized and existing under the laws of the State of Wyoming and has a principal place of business in Cincinnati, Ohio. Upon further information and belief, Capaxa's and SFG's operations entirely coexist with much, if not all, the same management and employees. Following suit, if one possesses confidential information then the other does as well.

### JURISDICTION & VENUE

22. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331. Specifically, Plaintiffs bring claims against Defendants for violations of federal unfair competition law under the Lanham Act, 15 U.S.C. § 1125. This Court, therefore, has supplemental jurisdiction of all state law claims under 28 U.S.C. § 1367.

23. This Court has subject matter jurisdiction over Plaintiffs' declaratory judgment pursuant to 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57.

24. This Court's exercise of personal jurisdiction over Defendants is fair and reasonable because Defendants demonstrated an intent to avail themselves to the benefits and protections of the laws that govern this forum through the nature, regularity, and relevance of Defendants' contacts with this forum.

25. As such, jurisdiction is reasonable and consistent with due process.

26. Venue is proper under, at least, 28 U.S.C. § 1391(b) because a significant portion of the events giving rise to Plaintiffs' claims occurred in this District and under 28 U.S.C. § 1391(c) because Defendants have their principal places of business within this Court's jurisdiction.

## BACKGROUND

### I. DEFENDANTS SOLICIT MCES TO MARKET AND SELL DEFENDANTS' PRODUCTS

27. The Parties sell CASD plans, governed under 26 U.S.C. § 7872 to credit unions and other tax-exempt entities.

28. CASD life insurance plans are a form of split-dollar arrangement in which an employer funds life insurance premiums for an executive while retaining a collateral interest in the policy to secure repayment of those premiums. The executive receives the economic benefit of the policy beyond the sponsor's secured interest, subject to the terms of the plan and the performance of the underlying insurance policy.

29. CASD plans, including those used by SFG, are long-established structures that have been publicly described in financial-planning literature since the 1960s and are governed by IRS notices and regulations. Independent publications provide overviews of split-dollar life insurance and describe the history, mechanics, and tax treatment of CASD plans in detail.

30. Although MCES and SFG were competitors in the same industry, SFG approached MCES to market and sell SFG's products. Most notably, SFG wanted MCES to market a CASD "rescue" solution that allowed existing plans to move to SFG's Capaxa pool

within LifeNotes. SFG's solution could be sold as a new plan rather than converting an existing one. To SFG, however, the sale of a new plan was more attractive financially because much of the commissions could not be transferred on already existing plans.

   A. **Capaxa Makes MCES and Millman Sign a Non-Disclosure Agreement with an Unenforceable "Non-Solicitation" Provision.**

31.     As Defendants forged a relationship with MCES, MCES and Millman, as CEO and President of MCES, executed the 2022 NDA, to which Acumen was not a party.

32.     Under the 2022 NDA, MCES, Millman and Defendants agreed to cooperate with each other to pursue complementary business opportunities:

> The parties intend by this agreement to cooperate with each other to pursue complementary business opportunities, which shall involve work with banks, corporations and certain tax-exempt organizations, healthcare provider organizations, higher education institutions, credit unions, or other disclosed target markets or potential clients including an entity's or organization's executives, employees, and member affinity groups ("Market") for the financing of certain financial product and investment portfolios including plan and program design, implementation, and support.

(Ex. 1, 2022 NDA, § 1).

33.     The 2022 NDA also prohibited the disclosure of "Confidential Information," defined as:

> non-public information provided by the other Party including Client information, including without limitation Originator or Client's copyrighted and other proprietary information, Client data, Client Personal Health Information (PHI), Originator or Client financial data, Originator or Client trade secrets, Originator or Client materials, and Originator plan designs or specifications, software, processes, plans, know-how, lists of Clients and target or prospective Clients, illustrations and related information, designs, data, business

9

relationships, projections, marketing data, marketing strategies, and methods of operation.

(*Id.* at § 3).

34.     "Confidential Information" does not include information generally known to the public or known to the receiving party independent of receipt from the disclosing party. (*Id.*). Thus, knowledge and expertise MCES or Millman held on their own or information in the public domain—particularly relating to CASD plans—is excepted from the 2022 NDA.

35.     The Producer Agreement contains a provision identical to Section Three of the 2022 NDA. (*See* Ex. 2, Producer Agreement, § 5).

36.     Defendants also try to use the 2022 NDA to eliminate MCES and Millman from the market, should the relationship cease, with a de facto non-compete provision disguised as a non-solicitation provision: "Producer shall not, independently or in association with any other than Originator, seek to provide to Clients, or to any member of the Market, services or products of the type or nature or any such that are substantially similar in force or effect as provided by Originator at any time during a period of thirty-six (36) months commencing on the later of the start of a Business Opportunity, or last Client contact, or termination of this Agreement." (*Id.* at § 4).

37.     The 2022 NDA purports to bind MCES's permitted successors and permitted assigns. (*Id.* at § 7). Acumen is neither a successor nor assign of MCES or Millman.

38. The 2022 NDA does not name or reference Acumen in any way, nor does the 2022 NDA contain an Acumen signature block. Accordingly, Acumen did not sign—and is not a party to—the 2022 NDA.

**B. MCES—not Acumen or Millman—Execute a Producer Agreement with SFG and Capaxa.**

39. Pursuant to the Producer Agreement, MCES and Defendants would share compensation following a "Successful Business Opportunity," otherwise defined as the "sale and placement of one or more SFG Product(s) to a client (if not then an existing client or actively pursued prospective Client or Client of SFG or another SFG Representative Producer) solicited on behalf of SFG by [MCES]." (Ex. 2, Producer Agreement, § 4).

40. Neither Acumen nor Millman, in his individual capacity, is a party to the Producer Agreement.

41. The Producer Agreement does not reference or include a signature block for Acumen, and Acumen never signed it.

42. Likewise, Millman signed only in his representative capacity as MCES's CEO/President, not personally:

Capaxa LLC
Stearns Financial Group LLC

By: _____
Name: J. Eric Stearns
Title: President

Accepted and Agreed:

PRODUCER

By: _Ryan Millman_
Name Ryan Millman
Title: CEO/President
Modern Capital

(Ex. 2, Producer Agreement, p. 6).

**II.** **MCES MARKETS SFG'S PRODUCTS TO MCES'S CUSTOMERS, USING SFG'S NON-PROPRIETARY INFORMATION THAT IS LARGELY AVAILABLE IN THE PUBLIC DOMAIN.**

**C.** **Defendants do Not Require MCES's Clients to Execute a Non-Disclosure Agreement to hear Presentations on SFG's Products.**

43. Beginning in the fourth quarter of 2022, MCES marketed and sold SFG's products, including the LifeNotes CASD solution by converting existing plans and selling new ones.

44. MCES then worked with an SFG representative to obtain information about the SFG product to be presented to the MCES client for application in the CASD plan.

45. SFG would provide customized information to MCES demonstrating how the SFG product would apply in the MCES client's CASD plan, for the specific purpose of MCES sharing this information about SFG's product with MCES's client.

46. Often, information about the SFG product would be provided to an MCES client on a slide or series of slides, to be accepted or rejected by MCES's client.

47. At times, the slides containing information about the SFG product would be prepared jointly by MCES and SFG. Often, SFG sent the information about the SFG product to MCES, asking MCES to prepare the slide on SFG's behalf, for presentation to MCES's Client directly and without SFG's participation, because SFG "didn't have the bandwidth" to perform the task itself.

48. When SFG provided customized information about its product to MCES, for the purpose of MCES presenting that information to MCES's clients, SFG typically never

required MCES's clients to sign a non-disclosure, confidentiality agreement, or any other agreement designating the information contained in it as confidential, proprietary, or a trade secret, nor would SFG take any effort to ensure the information provided to MCES's clients protected any alleged confidential, proprietary, or trade-secret information.

49. MCES further discovered that other companies that Defendants partnered with declined to execute a non-disclosure agreement, yet Defendants nonetheless provided those companies with the same information disclosed to MCES, undermining any concept of confidentiality.

50. Any notion that MCES has access to confidential or proprietary information is undermined by the plethora of information available to the public. And in fact, when SFG informed MCES it lacked the "bandwidth" to handle the labor to market the products to MCES's clients, MCES offered to assist in designing the products, which SFG adamantly opposed, segmenting the information it considered proprietary from that which is available to anyone with internet access.

### D. **Defendants Publicly Promote their Strategies.**

51. Defendants publicly market, describe, and explain the core mechanics of LifeNotes through articles, podcasts, and other media.

52. For example, in a June 13, 2025 article published by Blockleaders, SFG describes the operation of the LifeNotes Trust, including the pooling of large numbers of life insurance policies, the use of statistical mortality models, and the conversion of long-dated collateral assignment split-dollar assets into fixed-duration instruments with more

13

predictable yields. (From Split Dollar to Digital Dollars: How infineo and Stearns are Rewriting the Rules of Life Insurance - Blockleaders).

53.     On LifeNotes' publicly available website, Defendants tout:

a. LifeNotes' COMDEX score, indicating how strong various rating agencies, such as Moody's and Standard & Poor's, perceive the insurance carriers in the Capaxa pool;

How many Insurance Carriers are in LifeNotes Fund I. Does LifeNotes require a minimum Insurance Carrier rating?

The credit quality of Assets in LifeNotes Fund I is dependent on the Carriers that issue the Life Insurance Contracts. As Policies are added to LifeNotes Fund I, the limit on Carrier Credit is established in the Agreement as Carriers with a COMDEX score of 85 or greater (85th percentile by aggregate credit ratings or better) and credit agency ratings in the top 4 categories.

As of 4/30/2024, Life Notes Fund I

- 18 Total Insurance Carriers
- Weighted Average Comdex: 95.02

The values represented by such Policies have maturities ranging from 10 years to over 40 years and the COMDEX and credit ratings of Carriers are a point-in-time measurement that can change over the LifeNotes Fund I Duration. Rating agencies include the long-range viability of Carrier Issued Policies and the ability to pay death benefit obligations as well as bond issues, however, systemic factors remain outside the scope of such ratings.

b. How LifeNotes is paid;

How does LifeNotes get paid?

Fund I pay an asset-based fee for the management and administration of the trust. The fee is paid from the securitized spread, so it doesn't reduce the cash value yield and has no impact on benefit payments.

c. That there is no taxation change to the employee from moving their life insurance to LifeNotes.

Does the taxation of a CASD benefit change once a plan is moved into LifeNotes?

No. The key employee remains the owner of their Life Insurance and the arrangement set up between Employer and Employee via a Split Dollar Arrangement Agreement remains enforceable with all existing tax provisions in place.

(https://lifenotes.info/faq/). Thus, the benefits Defendants claim that LifeNotes and Capaxa bring to the market are readily available in the public domain.

54. Defendants even placed an entire 26-page PDF presentation on Supplemental Benefit Plans and the "purpose, nature, and process to achieve a SERP that supports recruitment, retention, and rewards non-profit executives, key employees, and associates." In part, the presentation illustrates the split-dollar structure.



([SERP Education & Overview](#)).

55. A Life Insurance Pooling Proposal from Defendants is readily available for review:

 

56. Defendants also took to YouTube to explain the dual benefits LifeNotes offers in that loan durations are shortened, executives receive more predictable or guaranteed retirement benefits, and risks associated with policy performance would not be pooled. (https://www.youtube.com/watch?v=61JOyuhDaJY).

57. Defendants advertise LifeNotes as a way to "rescue" underperforming life-insurance-funded deferred compensation plans, such as CASD arrangements, when changing interest rates or insurer performance cause those plans to fall short of original projections. Rather than requiring additional funding or abandoning the plan, LifeNotes allows the institution to restructure and transfer the economics of the plan into a trust, accelerating recovery of the employer's investment, shortening duration, and stabilizing returns. At the same time, executives can receive more predictable, often guaranteed benefits, preserving the core retention and tax advantages while reducing long-term risk and administrative complexity for the institution. In sum, SFG markets the LifeNotes strategy as a way for both sides to improve economics when compared to the original arrangement. (How LifeNotes Can Help Rescue A Deferred Compensation Plan - Stearns Financial).

58. SFG publicly promotes LifeNotes' claimed benefits and strengths. This information is neither confidential nor proprietary, and its widespread availability refutes Defendants' claims that the information is proprietary. Instead, it confirms that Defendants employ a strategy that is readily known to their competitors. Thus, Defendants cannot coerce MCES with their accusations.

59. Aside from the information that Defendants placed in the public domain, CASD solutions are widely known, undermining SFG's claims of confidentiality. For example:

   a. The Definitive Guide to Split Dollar Life Insurance Arrangements (explaining the fundamentals of a split-dollar life insurance policy between two parties to achieve tax-efficient estate planning or executive benefit goals);

   b. Department of the Treasury (referencing split-dollar life insurance arrangements governed under a loan regime in which payback occurs at a shorter duration, i.e., 5 or 10 years);

   c. Side Fund Split Dollar Under Loan Regime (discussing defined-term split-dollar arrangements);

   d. Artemis.bm (discussing a pooled-life-insurance concept backed by securities);

60. The confidentiality provisions in the Producer Agreement and 2022 NDA exclude publicly available and independently known information: "Confidential Information shall not include items and information (i) generally known to the public without breach of this agreement or other obligation of confidentiality and (ii) known to the receiving Party independently of receipt from the disclosing Party and without breach of any third party's obligation of confidentiality…" (Ex. 1, Producer Agreement, § 5; Ex. 2, 2022 NDA, § 3).

61. Split dollar solutions, pooled life insurance strategies, and LifeNotes' mechanics are publicly available, and Plaintiffs also had their own independent expertise. SFG segmented the information it considered proprietary from that which was provided to MCES. MCES—and therefore Acumen—had no visibility into post sale processes. Dollar

17

solutions, pooled life insurance strategies, and LifeNotes' mechanics are publicly available, and Plaintiffs sale processes.-dollar solutions, pooled life-insurance strategies, and LifeNotes' mechanics are publicly available, and Plaintiffs -sale processes.

### III.   SFG AND ACUMEN EXECUTE A NON-DISCLOSURE AGREEMENT.

62.   Although neither Millman nor MCES—and Acumen—had access to any proprietary information or "trade secrets," Defendants wanted Acumen to sign a non-disclosure agreement. Acumen and Defendants executed the 2025 NDA on May 3, 2025.

63.   But even when Acumen presented Defendants' information to Acumen's clients—just as SFG did not require MCES's clients to execute one—SFG did not require the prospects to sign a non-disclosure, confidentiality, or agreement other that said the information received was proprietary or a trade secret.

64.   Like the 2022 NDA, the 2025 NDA excluded information in the public domain or already lawfully possessed by Acumen:

**Article III. Exclusions from Confidential Information.** Notwithstanding the foregoing, Confidential Information shall not include information as to which Receiving Party can demonstrate:

(i)     was previously known by or lawfully in the possession of Receiving Party prior to its receipt from Disclosing Party as demonstrated by the records of Receiving Party;

(ii)    (a) is part of the public domain, through no fault, wrongful action or violation of this Agreement by Receiving Party; (b) is independently developed by or on behalf of Receiving Party with no reliance upon or usage of information disclosed to it by Disclosing Party as demonstrated by the records of Receiving Party; or (c) Receiving Party received such information from a third party owing no obligation of confidentiality to Disclosing Party as demonstrated by the records of Receiving Party.

(Ex. 3, 2025 NDA, Art. III).

18

65. The 2025 NDA executed by Acumen and Stearns is the only agreement between those two parties. Consequently, it is the only agreement governing the treatment of confidential information that applies to Acumen:

> **Article X. Entire Agreement.** This is the complete agreement between the Parties regarding the confidential treatment of any information exchanged between them in connection with the Business Opportunities and any modification or alteration hereof shall be accomplished only by a written agreement executed by both Parties.

(*Id.* at Art. X).

## IV. DEFENDANTS THREATEN UNENFORCEABLE CONSTRAINTS ON PLAINTIFFS AFTER FAILING TO PAY COMMISSIONS OWED TO MCES

66. Ultimately, Defendants breached the Producer Agreement by failing to pay MCES the owed commissions. While MCES tried to amicably resolve the dispute, it was met with accusations directed to Plaintiffs that only escalated the dispute.

67. On June 2, 2025, Defendants—through SFG—issued a written "Cease and Desist" asserting that Plaintiffs "misrepresent[ed] the nature, terms, or benefits" of LifeNotes to a client and "misrepresented the intentions of the use of the policy … to the carrier," further claiming that Plaintiffs' conduct "contravene[s] applicable laws and regulations," "exposed [the] client to substantial financial risk," and threatening to report "potentially fraudulent activity" to "appropriate regulatory authorities." (the "*June 2, 2025 Letter*").

68. This communication continued via a June 3, 2025 letter directed to Millman and Hinkle, where Defendants claimed—without basis—that Plaintiffs: (1) breached the Producer Agreement, even though Acumen and Millman were not parties to it; (2) defrauded SFG of monies owed under the Producer Agreement; (3) engaged in serious

misrepresentations to SFG's clients and business relations; (4) misappropriated SFG's business proprietary information and goodwill; and (5) interfered with SFG's contractual and business relationships. (the "*June 3, 2025 Letter*").

69.     To circumvent Millman's involvement, two days later, Defendants forwarded their June 3, 2025 Letter to Millman's business associates only (the "*June 5, 2025 Letter*"). Defendants also requested a meeting with the associates and not Millman the next day.

70.     Even more troubling, in the June 5, 2025 Letter, Defendants demanded that the associates go behind Millman's back and falsify a statement in Millman's name:

> C. Confirm your agreement to issue the following correspondence in the name of Ryan Millman and on behalf of Acumen, once a definitive list of impacted current and potential/prospective LifeNotes clients are identified: "*I wanted to reach out to connect you with the Stearns and LifeNotes Team. I will be out of the office for the coming weeks. As we want to make sure that you are well-served, their Team will be reaching out to set up a call along with Alex Bebis from the Acumen Team. Please reach out to Alex with any questions.*" Designated representatives of Stearns will also be required to be copied on these emails.
>
> D. This Zoom Meeting and the discussions engaged therein are to be strictly confidential and not shared with and/or disseminated to in any fashion or scope with Ryan Millman.
>
> Further, it is our opinion, respectfully, that you either are unaware of and/or do not fully understand the gravity of Mr. Millman's improper actions and the damages already incurred by my clients which, conservatively, are believed to be in excess of $5M (subject to escalation), and future ensuing damages and potential consequences that are certain to follow. In that regard, my clients will not entertain any further business relations with Acumen during the time that Mr. Millman and/or Modern Capital is in any way associated with Acumen.
>
> If you agree to the above conditions, we will agree to attend a Zoom Meeting tomorrow, Friday June 6, 2025 commencing at 11:30AM. If, after the conclusion of the Zoom Meeting, certain progress is made with you and Mr. Bebis to our satisfaction, then we will consider moving forward on June 10, 2025 in the Meet and Confer Meeting with Mr. Millman, only.
>
> Please advise by 4:30PM EST today on how you wish to proceed.

71.     In their June 5, 2025 Letter, Defendants, as a result of Plaintiffs' alleged wrongdoings, also claimed their damages to exceed Five Million Dollars: "Further, it is our opinion, respectfully, that you either are unaware of and/or do not fully understand the gravity of Mr. Millman's improper actions and the damages already incurred by my clients which, conservatively, are believed to be in excess of $5M (subject to escalation), and future ensuing damages and potential consequences that are certain to follow. In that regard, my

clients will not entertain any further business relations with Acumen during the time Mr. Millman and/or Modern Capital is in any way associated with Acumen."

72. Defendants' misconduct did not end with their written accusations. On June 9, 2025, Defendants escalated their campaign by directly contacting two of Millman's business associates via a phone call in an effort to pressure them into severing ties with him.

73. As a direct result of Defendants' false allegations contained in the June 5, 2025 Letter and their subsequent call, one of Millman's associates ultimately withdrew from MCES, fracturing long-standing professional relationships.

74. Defendants' interference extended beyond internal business relationships, as they also sought to disrupt Millman's client relationships.

75. On June 16, 2025, Defendants—acting through SFG—improperly contacted one of Plaintiffs' clients in an attempt to induce that client to abandon Plaintiffs and instead transfer its business into the Capaxa Pool.

76. Defendants continued their rhetoric on September 3, 2025, sending an *Immediate Cease and Desist* to Plaintiffs, alleging that Millman "[undertook] the improper action of changing [SFG's] clients' agent of record to himself (as opposed to SFG/LifeNotes)," purportedly violating the Producer Agreement. SFG and Capaxa then made an unfounded assertion that Millman's alleged actions were "likely illegal."

## V. DEFENDANTS ORCHESTRATE A SMEAR CAMPAIGN WITH INDUSTRY PARTNERS TO DETER CREDIT UNION PARTNERS AND PROSPECTS

77. Also in July 2025, Plaintiffs began receiving reports that Defendants themselves were circulating and publishing false statements about Plaintiffs to industry

21

partners, including TruStage Executive Benefit Solutions, a national credit union vendor, which later repeated those statements to other credit unions in the industry.

78. These statements mirrored the same false accusations Defendants made directly to Plaintiffs in their June 2, June 3, and June 5, 2025 correspondence—namely, that Plaintiffs were "bad actors," that Plaintiffs' products "would not work," that Plaintiffs were "defrauding customers," that Plaintiffs were improperly acting as agent of record, and that Plaintiffs had unresolved licensing or regulatory issues.

79. For example, in July 2025, one potential credit union partner reported receiving a TruStage email warning against working with Plaintiffs and repeating negative allegations about Plaintiffs' business and products, which originated from Defendants.

80. Credit union executives confirmed these statements were being circulated and that they were coming from TruStage based on information TruStage received from Defendants. Further, on or about October 20, 2025, Rodgers, on Plaintiffs' behalf, told (i) a Colorado-based credit union and (ii) one of Acumen's referral/channel partners that: (1) Millman engaged in behaviors that resulted in a license suspension, with complete disregard as to the truth or veracity of the false statement; (2) Plaintiffs were again, "bad actors;" (3) and Plaintiffs' life-insurance products violation Regulation "O," 12 U.S.C. § 375a, which is patently false. On or around July 31, 2025, Plaintiffs were notified of the same comments being made to a Utah-based credit union. Upon information and belief, the statements were made by TruStage, acting as Defendants' mouthpiece.

81. On or about September 9, 2025, in the middle of ongoing discussions of partnering with Acumen in a business relationship, a leading, global financial services company advised Plaintiffs that it spoke with Defendants and was told that Millman was engaged in fraud and regulatory violations, and that it "had things" on Acumen and Millman.

82. And, in December of 2025, another potential credit union partner confirmed she had seen negative "chatter" about Plaintiffs on industry message boards, which she understood to be coming from TruStage, and sought assurance before proceeding with Plaintiffs.

## VI. DEFENDANTS' CONTINUE THEIR PATTERN OF FALSE AND UNSUPPORTED CLAIMS

83. While Defendants were disseminating false statements about Plaintiffs to credit-union officials, they simultaneously escalated their personal attacks on Plaintiffs, issuing a September 3, 2025 Immediate Cease and Desist to Plaintiffs, which alleged that Millman "[undertook] the improper action of changing [SFG's] clients' agent of record to himself (as opposed to SFG/LifeNotes)," purportedly violating the Producer Agreement. SFG and Capaxa then made an unfounded assertion that Millman's alleged actions were "likely illegal."

84. The next day, Defendants claimed Millman and Acumen "engaged in overt trade secret violations" and used a life insurance product called *MaxCap* to, "among other things, mimic LifeNotes to interfere with SFG's clients and business" and "defraud customers."

23

85.     On September 9, 2025, Defendants alleged that Millman and Acumen shared trade secrets with another company to undercut and compete with Defendants.

86.     On December 11, 2025, SFG and Capaxa sent yet another *Termination and Breach*, again claiming that Plaintiffs breached the Producer Agreement and 2022 NDA, including, but not limited to, the purported non-solicitation and non-disclosure provisions.

87.     It appears that Defendants' goal was to force Plaintiffs to abandon their core business practices. Moreover, Defendants repeatedly made these assertions toward Acumen and Millman without regard to whether they were parties to the relevant agreements or whether the provisions are enforceable against them. Because ripe and justiciable controversies exist, Plaintiffs request the Court's intervention as follows.

88.     Defendants have demanded that Plaintiffs cease specified business activities and have asserted that Plaintiffs are bound by and in breach of the referenced agreement provisions, including non-solicitation and confidentiality obligations. Defendants have further threatened litigation and/or other enforcement action and have asserted damages exceeding $5 million. These threats have created an immediate and ongoing controversy that is impairing Plaintiffs' ability to conduct ordinary business, service clients, and pursue prospective engagements, and declaratory relief will resolve that uncertainty.

## COUNT ONE
### 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57
**Declaratory Judgment that Acumen is not a Party to or Bound to the 2022 NDA**

89.     Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

24

90. An actual and justiciable controversy exists between the Parties regarding whether Acumen is a party to and bound by the 2022 NDA.

91. Defendants assert that Acumen is a party or bound to the 2022 NDA irrespective of the facts (1) Acumen did not sign the 2022 NDA, (2) the 2022 NDA does not name Acumen, and (3) Acumen is not Millman's or MCES's successor or assign.

92. Acumen and MCES request the Court to declare that Acumen is not a party to the 2022 NDA or bound by it, and thus has no contractual obligations under the 2022 NDA, including any confidentiality, non-disclosure, non-solicitation, or restrictive covenants.

93. Such a declaration is proper because it will terminate the controversy between the Parties and remove uncertainty regarding Plaintiffs' rights and obligations.

**COUNT TWO**
**28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57**
**(In the Alternative to Count One)**
**Declaratory Judgment that (1) Section Four of the 2022 NDA is Unenforceable and/or (2) Acumen did not Breach the 2022 NDA**

94. Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

95. Alternatively, if the Court determines Acumen is a party to the 2022 NDA, then an actual and justiciable controversy exists between the Parties regarding the interpretation, validity, and enforceability of certain provisions in the 2022 NDA. These controversies relate to:

> ➢ Whether Section Four, titled "Non-Solicitation," is enforceable, as it imposes restrictions that are unreasonable in scope, duration, and application, extending far beyond what is necessary to protect any legitimate business interest, especially when Plaintiffs had no access to

25

Defendants' proprietary "trade secrets," thus acting as a de facto non-competition provision;

➢ Whether Plaintiffs, as Defendants allege, breached Section Three when Plaintiffs (1) could not access Defendants' proprietary information or "trade secrets" and (2) Defendants' strategies and approaches to "rescuing" split-dollar plans are readily available in the public domain; and

➢ Whether Defendants have been damaged in excess of $5 million dollars as alleged.

96.    Plaintiffs request the Court to declare that:

➢ Section Four of the 2022 NDA is unenforceable and unreasonable in scope ("substantially similar" services to the "Market"), duration (36 months), and application, extending far beyond what is necessary to protect any legitimate business interest;

➢ Acumen did not breach the 2022 NDA, including, but not limited to, Sections Three and Four (if found to be enforceable); and

➢  Defendants did not sustain any damages.

97.    These declarations are proper because they will terminate the controversy between the parties and remove uncertainty regarding Plaintiffs' rights and obligations.

## COUNT THREE
### 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57
**Declaratory Judgment that Acumen and Millman are not Parties to the Producer Agreement**

98.    Plaintiffs incorporate the preceding paragraphs as if fully restated herein.

99.    An actual and justiciable controversy exists between Acumen and Millman and Defendants regarding whether Acumen and Millman are parties to the Producer Agreement.

26

100.    Defendants claim otherwise even though (1) Acumen is not referenced in it, nor is Millman in his individual capacity and (2) neither Acumen nor Millman in his individual capacity signed or agreed to be bound by the Producer Agreement.

101.    Plaintiffs request the Court declare that Acumen and Millman are not parties to the Producer Agreement, and thus have no contractual obligations under the Producer Agreement.

102.    Such a declaration is proper because it will terminate the controversy between the parties and remove uncertainty regarding Plaintiffs' rights and obligations.

**COUNT FOUR**
**28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57**
**(In the Alternative to Count Three)**
**Declaratory Judgment that Acumen and Millman did not Breach the Producer Agreement**

103.    Plaintiffs incorporate the preceding paragraph as if fully restated herein.

104.    Alternatively, if the Court determines Acumen or Millman are parties to the Producer Agreement, then an actual and justiciable controversy exists between the Parties regarding the interpretation, validity, and enforceability of certain provisions in the Producer Agreement. These controversies relate to:

> ➢ Whether Acumen or Millman breached Section Five and disclosed "Confidential Information" when much of Defendants' strategies and approach to split-dollar plans is readily available in the public domain;

> ➢ Whether Acumen or Millman breached Section Six and sought to provide SFG Products to Clients with open Business Opportunities at any time during a period of twelve (12) months commencing on the later of the cessation or closing of a Business Opportunity, or termination of the Producer Agreement; and

➢ Whether Defendants have been damaged in excess of $5 million dollars as alleged.

105. Plaintiffs request the Court declare that Acumen or Millman did not breach the Producer Agreement, including, but not limited to, Sections Five and Six, and that Defendants did not sustain any damages as they allege.

106. Such a declaration is proper because it will terminate the controversy between the parties and remove uncertainty regarding Plaintiffs' rights and obligations.

**COUNT FIVE**
**28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57**
**Declaratory Judgment that (1) the 2025 NDA—not the 2022 NDA—is the only NDA Acumen is Subject to Regarding this Lawsuit and (2) Acumen did not Violate it**

107. Plaintiffs incorporate the preceding paragraph as if fully restated herein.

108. The 2025 NDA is the complete agreement regarding the confidential treatment of any information exchanged between Acumen and Defendants. (*See id.* at Art. X).

109. Acumen requests the Court declare that (1) with respect to Defendants, the 2025 NDA is the sole NDA Acumen is subject to, (2) Acumen did not breach the 2025 NDA, and Defendants have not been damaged in any way.

110. Such declarations are proper because they will terminate the controversy between the Parties and remove uncertainty regarding Acumen's rights and obligations.

**COUNT SIX**
**Defamation**

111. Plaintiffs incorporate the preceding paragraph as if fully restated herein.

28

112. Defendants, acting directly and through their agents, disseminated and published false statements of fact about Plaintiffs, including that Plaintiffs: (i) misrepresented products to clients and a carrier, (ii) engaged in or exposed clients to "potentially fraudulent activity," (iii) "stole" or "defrauded" commissions, (iv) were being investigated by regulators and engaged in conduct "likely illegal," and (v) engaged in "overt trade secret violations," marketed a "copycat" product to "defraud customers," and improperly changed agents-of-record.

113. Defendants sent and forwarded accusatory letters/emails to Plaintiffs' business associates, excluding Millman, falsely asserting Plaintiffs' misconduct, demanding scripted client communications in Millman's name, and threatening damages "in excess of $5M." These publications were made to third parties and intended for further dissemination.

114. Defendants communicated the same false accusations to Plaintiffs' business associates, potential credit union partners, and others.

115. At the time of publication, Defendant knew or should have known these statements were not true or were substantially not true.

116. Defendants published statements intentionally, or at minimum with reckless disregard for the truth, and with malice, in that they made and disseminated false allegations for the improper purpose of harming Plaintiffs' reputation and business relationships.

117. As a direct and proximate result of Defendants' false statements, Plaintiffs have sustained damages in an amount exceeding $75,000, the precise amount to be determined at trial, together with attorneys' fees, costs, and pre- and post-judgment interest.

29

## COUNT SEVEN
### Intentional and Tortious Interference with Business Relationships

118. Plaintiffs incorporate the preceding paragraph as if fully restated herein.

119. Plaintiffs maintained ongoing and prospective business relationships with credit-union clients, executives, and referral partners, including active opportunities for executive-benefit, CASD, and related financial-services engagements.

120. Defendants knew of these existing and prospective business relationships because Plaintiffs disclosed clients and prospects during the parties' dealings, because the parties collaborated on overlapping opportunities, and because Defendants communicated directly with several of Plaintiffs' clients and referral partners.

121. Defendants intentionally and improperly interfered with these relationships by, among other things, publishing false statements concerning Plaintiffs' integrity, professional conduct, and regulatory compliance; sending accusatory letters to third parties; demanding that fabricated communications be issued to Plaintiffs' clients; and disseminating or causing the dissemination of false information to industry participants, including credit-union officials and vendor personnel, which foreseeably disrupted Plaintiffs' business relationships.

122. Defendants' conduct was wrongful, malicious, without privilege or justification, and undertaken for the improper purpose of harming Plaintiffs' business, damaging their reputation, and diverting client opportunities and economic benefits away from Plaintiffs.

123.    As a direct and proximate result of Defendants' false statements, Plaintiffs have sustained damages in an amount exceeding $75,000, the precise amount to be determined at trial, together with attorneys' fees, costs, and pre- and post-judgment interest.

### COUNT EIGHT
**(Violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))**

124.    Plaintiffs incorporate the preceding paragraphs as if fully rewritten herein.

125.    Plaintiffs and Defendants are competitors in interstate commerce in the market for executive benefits, supplemental executive retirement, CASD plans, and related financial services sold to credit unions and other mission-driven institutions.

126.    Specifically, Defendants published, or intended and caused to be published, statements to Plaintiffs' business associates, referral partners, industry vendors, credit-union clients, and prospective credit-union clients asserting, among other things, that Plaintiffs:

➢    misrepresented products to clients and carriers;

➢    engaged in or exposed clients to "potentially fraudulent activity;"

➢    violated applicable laws and regulations;

➢    defrauded customers or stole commissions;

➢    engaged in "trade secret violations;"

➢    violated Regulation O;

➢    were "bad actors;"

➢    marketed a "copycat" or unlawful product; and

➢    engaged in conduct that was "likely illegal."

31

127.     These statements were statements of fact, not opinion, and were false or, at minimum, misleading when made.

128.     Defendants made these statements in commercial advertising or promotion to Plaintiffs' competitors with the understanding they would be related to the Parties' potential customers. These statements were intended to influence purchasing and business-relationship decisions so that business may be diverted away from Plaintiffs

129.     Defendants' statements were material because allegations of fraud, illegality, regulatory violations, trade-secret theft, and unethical conduct are likely to—and did—affect the decisions of credit-union clients, referral partners, and industry participants regarding whether to do business with Plaintiffs.

130.     Defendants disseminated these false and misleading statements in interstate commerce.

131.     Defendants' false and misleading statements actually deceived, or were likely to deceive, a substantial segment of the relevant purchasing and referral audience.

132.     As a direct and proximate result of Defendants' false advertising and commercial disparagement, Plaintiffs have suffered and continue to suffer competitive injury, including loss of business opportunities, disruption of existing and prospective relationships, reputational harm, and diversion of clients and goodwill to Defendants. Plaintiffs are also faced with Defendants' repeated efforts to stifle their business practices and relationships with repeated threats of litigation if they do not comply with Defendants' demands.

133. As a direct and proximate result of Defendants' false statements, Plaintiffs have sustained damages in an amount exceeding \$75,000, the precise amount to be determined at trial, together with attorneys' fees, costs, and pre- and post- judgment interest.

**WHEREFORE**, Plaintiffs request judgment as follows:

A. That the Court issue an order declaring the following findings of fact and law:

1. **As to Count One**

   ➢ Acumen is not a party to the 2022 NDA executed between Defendants and MCES; and

   ➢ Acumen has no contractual obligations under the 2022 NDA, including any confidentiality, non-disclosure, non-solicitation, or restrictive covenants.

2. **As to Count Two (In the Alternative to Count One)**

   ➢ Section Four of the 2022 NDA is unenforceable because it imposes restrictions that are unreasonable in scope, duration, and application, extending far beyond what is necessary to protect any legitimate business interest, making removal from the 2022 NDA necessary;

   ➢ Acumen did not breach the 2022 NDA, including, but not limited to, Sections Three and Four (if found to be enforceable); and

   ➢ Defendants did not sustain any damages.

3. **As to Count Three**

   ➢ Acumen or Millman are not parties to the Producer Agreement, and thus have no contractual obligations under it.

4. **As to Count Four (In the Alternative to Count Three)**

> ➢ Acumen and Millman did not breach Sections Five or Six of the Producer Agreement; and

> ➢ Defendants did not sustain any damages.

5. **As to Count Five**

> ➢ With respect to Defendants, the 2025 NDA is the sole NDA Acumen and SFG are subject to;

> ➢ Acumen did not breach the 2025 NDA; and

> ➢ Defendants did not sustain any damages.

B. The Court issue the following:

1. **As to Count Six**

> ➢ An award of compensatory, general, special, and presumed damages;

> ➢ An award of punitive damages based on Defendants' actual malice; and

> ➢ Injunctive relief prohibiting Defendants from publishing or causing the publication of further false statements concerning Plaintiffs; and

> ➢ An award of attorneys' fees, costs, and expenses.

2. **As to Count Seven**

> ➢ An award of attorneys' fees, costs, and expenses;

> ➢ Punitive damages; and

> ➢ Such other and further relief as the Court deems just, equitable, and proper; and

> ➢ An award of attorneys' fees, costs, and expenses.

3. **As to Count Eight**

34

➢ An award of attorneys' fees, costs, and expenses;

➢ Punitive damages; and

➢ Such other and further relief as the Court deems just, equitable, and proper; and

➢ An award of attorneys' fees, costs, and expenses.

C. Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury pursuant to Fed. R. Civ. P. 38.

*/s/ Jon J. Pinney*

JON J. PINNEY (0072761)

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ LLP**

*/s/ Jon J. Pinney*

JON J. PINNEY (0072761) (*TRIAL ATTORNEY*)
MICHAEL R. CANTU (0095335)
ISRA T. GHANEM (0104238)
JOSEPHINE F. FORNEY (0106345)
1375 East Ninth Street, 29th Floor
Cleveland, Ohio 44114
Phone: 216-696-8700/Fax: 216-621-6536
Email: jjp@kjk.com; mrc@kjk.com; itg@kjk.com; jff@kjk.com

*Counsel for Plaintiffs*

35