UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |
|---|---|
| ACUMEN FINANCIAL ADVANTAGE, LLC, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>SFG EXECUTIVE BENEFITS LLC d/b/a STEARNS FINANCIAL GROUP, LLC, *et al.*,<br><br>    Defendants. | **Case No. 1:26-CV-00163-MWM**<br><br><br>**Judge Matthew W. McFarland** |
| SFG EXECUTIVE BENEFITS LLC d/b/a STEARNS FINANCIAL GROUP, LLC and CAPAXA, LLC,<br><br>    Counter-Plaintiffs,<br><br>  v.<br><br>RYAN MILLMAN, MODERN CAPITAL EXECUTIVE SOLUTIONS, INC., ACUMEN FINANCIAL ADVANTAGE, LLC., SCOTT HINKLE, and BAYCREST CONSULTANTS LLC,<br><br>    Counter-Defendants. | **JURY DEMAND ENDORSED HEREON** |

**ANSWER AND COUNTERCLAIMS OF DEFENDANTS SFG EXECUTIVE BENEFITS
LLC d/b/a STEARNS FINANCIAL GROUP, LLC, CAPAXA, LLC,
<u>AND INFINEO HOLDINGS, INC.</u>**

Defendants SFG Executive Benefits LLC d/b/a Stearns Financial Group, LLC ("SFG"), Capaxa, LLC ("Capaxa"), and Infineo Holdings, Inc. ("Infineo," together with SFG and Capaxa, "Defendants"), by and through their undersigned counsel, hereby submit the following answer and affirmative defenses (the "Answer") to the Complaint filed by Acumen Financial Advantage, LLC, Modern Capital Executive Solutions, Inc. ("Modern Capital"), and Ryan Millman (together, "Plaintiffs") (ECF No. 1, the "Complaint"). The paragraph numbers of Defendants' responses set forth below correspond to the paragraph numbering of the Complaint.

Except as otherwise expressly admitted in this Answer, Defendants deny each and every allegation contained in the Complaint. Defendants do not interpret headings as well-pleaded allegations of fact to which any response is required. To the extent a response is deemed required, Defendants deny all allegations in the headings (or sub-headings) in the Complaint. Unless otherwise defined, capitalized terms shall refer to the capitalized terms defined in the Complaint, but such use is not an acknowledgement or admission of any characterization Plaintiffs may ascribe to the defined terms. Defendants' investigation and discovery regarding the facts alleged in the Complaint are ongoing, and Defendants reserve the right to amend or supplement this Answer as may be necessary.

1. Defendants admit the allegations in Paragraph 1 regarding their business operations. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 1 as to Plaintiffs' business operations and therefore deny the same.

2. Defendants admit the allegations in Paragraph 2.

3. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 3 and therefore deny the same.

4.      Defendants admit that SFG and Capaxa entered into an Advisor Producer Agreement with Millman and Modern Capital in 2022, whereby Millman and Modern Capital were to market and sell SFG products in exchange for a split in commissions, but otherwise deny the allegations in Paragraph 4.

5.      Defendants admit the allegations in Paragraph 5.

6.      Defendants admit the allegations in Paragraph 6.

7.      Defendants admit that SFG and Capaxa initially made payments. Defendants further state that the allegations in Paragraph 7 state legal conclusions as to which no response is required, and Defendants deny any remaining allegations in Paragraph 7.

8.      Defendants admit the allegations in Paragraph 8.

9.      Defendants admit that Infineo and SFG operate collaboratively, with Infineo publicly marketing SFG and Capaxa on its website and offering complementary services. The third sentence of Paragraph 9 states a legal conclusion as to which no response is required. To the extent a response is required, Defendants deny the allegations in the third sentence of Paragraph 9. Defendants further deny all remaining allegations in Paragraph 9.

10.      Defendants deny the allegations in Paragraph 10.

11.      The allegations in the first and second sentences of Paragraph 11 state legal conclusions as to which no response is required. The allegations in the second sentence of Paragraph 11 purport to characterize a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in the first and second sentences of Paragraph 11. With respect to footnote 2 to Paragraph 11, Defendants admit that Modern Capital and Millman initiated an arbitration under the American Arbitration Association against SFG and Capaxa on the same date as they filed the Complaint in the instant litigation

concerning the same issues as in the instant litigation, but otherwise deny the allegations in footnote 2 to Paragraph 11.

12. The allegations in Paragraph 12 purport to characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 12 and deny that any relief should be granted to Plaintiffs.

13. The allegations in Paragraph 13 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 13.

14. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14 and therefore deny the same.

15. The allegations in Paragraph 15 purport to characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 15 and deny that any relief should be granted to Plaintiffs.

16. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 16 and therefore deny the same.

17. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17 and therefore deny the same.

18. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 18 and therefore deny the same.

19. Defendants admit the allegations in Paragraph 19.

20. Defendants admit the allegations in Paragraph 20.

21. Defendants admit the allegations in the first sentence of Paragraph 21. With respect to the second sentence of Paragraph 21, Defendants admit that SFG and Capaxa share the same management and many of the same employees, but deny the remaining allegations, and therefore

deny the allegations in the second and third sentences in Paragraph 21.

22. The allegations in Paragraph 22 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 22.

23. The allegations in Paragraph 23 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 23.

24. The allegations in Paragraph 24 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 24.

25. The allegations in Paragraph 25 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 25.

26. The allegations in Paragraph 26 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 26.

27. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 27 and therefore deny the same.

28. Defendants admit the allegations in Paragraph 28.

29. Defendants admit the allegations in Paragraph 29.

30. Defendants admit the allegations in Paragraph 30.

31. Defendants admit that on August 8, 2022, Modern Capital and Millman executed the 2022 NDA, but otherwise deny the allegations in Paragraph 31.

32. The allegations in Paragraph 32 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 32.

33. The allegations in Paragraph 33 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny

the allegations in Paragraph 33.

34. The allegations in Paragraph 34 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 34.

35. The allegations in Paragraph 35 refer to and purport to interpret documents that speak for themselves, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 35.

36. The allegations in Paragraph 36 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 36.

37. The allegations in the first sentence of Paragraph 37 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 37. The allegations in the second sentence of Paragraph 37 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 37.

38. The allegations in the first sentence of Paragraph 38 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 38. The allegations in the second sentence of Paragraph 38 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 38.

39. The allegations in Paragraph 39 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 39.

40. The allegations in Paragraph 40 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 40.

41. The allegations in Paragraph 41 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 41.

42. The allegations in Paragraph 42 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 42.

43. Defendants deny the allegations in Paragraph 43.

44. Defendants admit that on several instances, Modern Capital sought to receive information from SFG about SFG products, supposedly for presentation to the Modern Capital client, but otherwise deny the remaining allegations in Paragraph 44.

45. Defendants admit the allegations in Paragraph 45.

46. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 46 and therefore deny the same.

47. Defendants deny the allegations in Paragraph 47.

48. Defendants deny the allegations in Paragraph 48.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50.

51. Defendants admit that they conduct marketing through articles, podcasts, and other media, but otherwise deny the allegations in Paragraph 51.

52. The allegations in Paragraph 52 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny

the allegations in Paragraph 52.

53. The allegations in the first sentence of Paragraph 53 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 53. Defendants deny the allegations in the second sentence of Paragraph 53.

54. The allegations in Paragraph 54 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 54.

55. The allegations in Paragraph 55 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 55.

56. The allegations in Paragraph 56 refer to and purport to interpret a video that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 56.

57. The allegations in Paragraph 57 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 57.

58. Defendants admit the allegations in the first sentence of Paragraph 58. Defendants deny the remaining allegations in Paragraph 58.

59. Defendants deny the allegations in the first sentence of Paragraph 59. The allegations in the second sentence of Paragraph 59 refer to and purport to interpret websites and documents that speak for themselves, so no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 59.

60.     The allegations in Paragraph 60 refer to and purport to interpret documents that speak for themselves, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 60.

61.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 61 regarding Plaintiffs' "expertise" and "visibility" and therefore deny the same. Defendants admit that certain information about split dollar solutions, pooled life insurance strategies, and LifeNotes' mechanics is publicly available, but deny the remaining allegations in Paragraph 61.

62.     Defendants admit that Acumen and SFG executed a non-disclosure agreement on May 3, 2025, and that Defendants had wanted Acumen to do so, but otherwise deny the remaining allegations in Paragraph 62.

63.     Defendants deny the allegations in Paragraph 63.

64.     The allegations in Paragraph 64 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 64.

65.     The allegations in the first sentence of Paragraph 65 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 65. The allegations in the second sentence of Paragraph 65 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 65.

66.     The allegations in the first sentence of Paragraph 66 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 66. Defendants deny the allegations in the second

9

sentence of Paragraph 66.

67.     The allegations in Paragraph 67 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 67.

68.     The allegations in Paragraph 68 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 68.

69.     Defendants admit that they sent the June 3, 2025 Letter to two other principals of Acumen on June 5, 2025, and requested a meeting to discuss the ongoing dispute, but otherwise deny the allegations in Paragraph 69.

70.     The allegations in Paragraph 70 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 70.

71.     The allegations in Paragraph 71 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 71.

72.     Defendants deny the allegations in Paragraph 72.

73.     Defendants deny the allegations in Paragraph 73.

74.     Defendants deny the allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

76.     The allegations in Paragraph 76 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 76.

77. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 77 and therefore deny the same.

78. Defendants deny the allegations in Paragraph 78.

79. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 79 and therefore deny the same.

80. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first, second, and third sentences of Paragraph 80 and therefore deny the same. Defendants deny the allegations in the fourth sentence of Paragraph 80.

81. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 81 and therefore deny the same.

82. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 82 and therefore deny the same.

83. Defendants admit that they sent a cease and desist to Plaintiffs on September 3, 2025. The remaining allegations in Paragraph 83 refer to and purport to interpret this document, which speaks for itself, so no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 83.

84. The allegations in Paragraph 84 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 84.

85. The allegations in Paragraph 85 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 85.

86. With respect to the allegations in Paragraph 86, Defendants admit that they sent a

11

Termination and Breach letter to Plaintiffs on December 11, 2025. The remaining allegations in Paragraph 86 refer to and purport to interpret a document that speaks for itself, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 86.

87. Defendants deny the allegations in the first and second sentences of Paragraph 87. The third sentence of Paragraph 87 characterizes the relief that Plaintiffs seek and states a legal conclusion, so no response is required. To the extent a response is required, Defendants deny the allegations in the third sentence of Paragraph 87.

88. Defendants admit the allegations in the first and second sentences of Paragraph 88. The allegations in the third sentence of Paragraph 88 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 88.

89. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

90. The allegations in Paragraph 90 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 90.

91. The allegations in Paragraph 91 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 91.

92. The allegations in Paragraph 92 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 92.

93. The allegations in Paragraph 93 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 93.

94. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

95. The allegations in Paragraph 95 characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 95.

96. The allegations in Paragraph 96 characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 96.

97. The allegations in Paragraph 97 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 97.

98. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

99. The allegations in Paragraph 99 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 99.

100. With respect to the allegations in Paragraph 100, Defendants admit that they disagree with Plaintiffs regarding the scope of the Producer Agreement but otherwise deny the remaining allegations in Paragraph 100.

101. The allegations in Paragraph 101 characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 101.

102. The allegations in Paragraph 102 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 102.

103. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

104. The allegations in Paragraph 104 state legal conclusions as to which no response is

required. To the extent a response is required, Defendants deny the allegations in Paragraph 104.

105. The allegations in Paragraph 105 characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 105.

106. The allegations in Paragraph 106 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 106.

107. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

108. The allegations in Paragraph 108 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 108.

109. The allegations in Paragraph 109 characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 109.

110. The allegations in Paragraph 110 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 110.

111. Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

112. Defendants deny the allegations in Paragraph 112.

113. The allegations in the first sentence of Paragraph 113 refer to and purport to interpret documents that speak for themselves, so no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 113. Defendants deny the allegations in the second sentence of Paragraph 113.

114. Defendants deny the allegations in Paragraph 114.

14

115.    Defendants deny the allegations in Paragraph 115.

116.    Defendants deny the allegations in Paragraph 116.

117.    Defendants deny the allegations in Paragraph 117.

118.    Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

119.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 119 and therefore deny the same.

120.    Defendants admit they were made aware of some of Plaintiffs' business relationships, but otherwise deny the remaining allegations in Paragraph 120.

121.    Defendants deny the allegations in Paragraph 121.

122.    Defendants deny the allegations in Paragraph 122.

123.    Defendants deny the allegations in Paragraph 123.

124.    Defendants incorporate by reference each response and denial set forth in the foregoing paragraphs as if fully set forth herein.

125.    Defendants deny the allegations in Paragraph 125.

126.    The allegations in Paragraph 126 refer to and purport to interpret documents that speak for themselves, so no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 126.

127.    Defendants deny the allegations in Paragraph 127.

128.    Defendants deny the allegations in Paragraph 128.

129.    The allegations in Paragraph 129 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 129.

130.    Defendants deny the allegations in Paragraph 130.

131.    The allegations in Paragraph 131 state legal conclusions as to which no response is required. To the extent a response is required, Defendants deny they made any false and misleading statements and deny the remaining allegations in Paragraph 131.

132.    Defendants deny the allegations in Paragraph 132.

133.    Defendants deny the allegations in Paragraph 133.

The last section of the Complaint purports to characterize the relief that Plaintiffs seek, so no response is required. To the extent a response is required, Defendants deny that any relief should be granted to Plaintiffs.

## AFFIRMATIVE DEFENSES

Defendants set forth their affirmative defenses below. Defendants assert their affirmative defenses against all causes of action. By asserting these affirmative defenses, Defendants do not and should not be deemed to assume the burden of proving any fact, issue, or element of a cause of action where that burden properly belongs to Plaintiffs. And nothing stated herein is intended or shall be construed as an acknowledgment that any particular issue or subject matter is necessarily relevant to Plaintiffs' allegations.

Defendants reserve the right to amend this Answer, including the right to add, delete, or modify defenses based on newly discovered facts, clarification of existing facts, new law, or further legal analysis.

## FIRST AFFIRMATIVE DEFENSE
### (Truth)

Plaintiffs' causes of action for Defamation, Lanham Act (15 U.S.C. § 1125(a)(1)(B)) violations, and Intentional and Tortious Interference with Business Relationships are barred by virtue of the truth of Defendants' statements referenced throughout the Complaint, including but not limited to, those referenced in Paragraphs 111, 112, 113, 114, 115, 116, 117, 121, 122, 123,

124, 126, 127, 128, 129, 130, 131, 132, and 133.

## SECOND AFFIRMATIVE DEFENSE
### (Unclean Hands)

Each and every cause of action in the complaint is barred by the doctrine of unclean hands as a result of the acts and omissions in the matters relevant to this dispute, including but not limited to Plaintiffs fraudulently concealing from Defendants commissions owed to Defendants under the Producer Agreement. Plaintiffs have unclean hands and are therefore barred from entitlement to relief.

## THIRD AFFIRMATIVE DEFENSE
### (Justification)

Plaintiffs' claims are barred, in whole or in part, because Defendants had legitimate business and/or economic justifications for the conduct at issue.

## FOURTH AFFIRMATIVE DEFENSE
### (No Entitlement to Attorney's Fees)

Without conceding that any act of Defendants caused damage to Plaintiffs or any other person in any respect, Plaintiffs are not entitled to attorneys' fees by law or under any agreement between Defendants and Plaintiffs.

## FIFTH AFFIRMATIVE DEFENSE
### (No Entitlement to Punitive Damages)

Without conceding that any act of Defendants caused damage to Plaintiffs or any other person in any respect, Plaintiffs are not entitled to punitive damages by law or under any agreement between Defendants and Plaintiffs.

## SIXTH AFFIRMATIVE DEFENSE
### (No Breach of Contract)

Defendants have fully performed and discharged their duties and obligations to Plaintiffs under all relevant agreements between Plaintiffs and Defendants.

## SEVENTH AFFIRMATIVE DEFENSE
### (Plaintiffs' Breach)

For any cause of action in the Complaint based on Defendants' alleged breach of the Producer Agreement, 2022 NDA, or any agreement between Defendants and Plaintiffs, that cause of action is barred by Plaintiffs' own breach of the agreements, including but not limited to Plaintiffs fraudulently concealing from Defendants commissions owed to Defendants under the Producer Agreement, Plaintiffs' violation of the Non-Solicitation provision of the Producer Agreement, and Plaintiffs' misappropriation of Defendants' products in violation of the Producer Agreement.

## EIGHTH AFFIRMATIVE DEFENSE
### (Equitable Estoppel)

Having contributed to the breach of contracts alleged in the Complaint, Plaintiffs are equitably estopped from seeking damages for an alleged breach of the Producer Agreement based on Plaintiffs' own breach of the contract and breach of the duty of good faith and fair dealing, including but not limited to Plaintiffs fraudulently concealing from Defendants commissions owed to Defendants under the Producer Agreement, Plaintiffs' violation of the Non-Solicitation provision of the Producer Agreement, Plaintiffs' misappropriation of Defendants' products in violation of the Producer Agreement, and Plaintiffs' fraudulent misrepresentations to Defendants in the course of their business relationship under the Producer Agreement.

**COUNTERCLAIMS**

1. Stearns Financial Group, LLC ("SFG") and Capaxa, LLC ("Capaxa," together with SFG, "Counter-Plaintiffs") hereby file their Counterclaims against Ryan Millman ("Millman"), Acumen Financial Advantage, LLC ("Acumen"), Modern Capital Executive Solutions, Inc. ("Modern Capital"), Scott Hinkle ("Hinkle"), and Baycrest Consultants, LLC ("Baycrest") (together, "Counter-Defendants") as set forth below:

**INTRODUCTION**

2. Counter-Plaintiffs are innovators in the executive benefits industry and market a unique solution to non-profit institutions that allows them to offer supplemental executive retirement plans ("SERPs") with significantly more benefits at lower cost to non-profit employers. This case is about the intentional and wrongful scheme designed and carried out by Counter-Defendants and unknown associates to (i) defraud Counter-Plaintiffs and client non-profits and their executives by causing clients to purchase unworkable and fraudulent SERPs, which non-profit executives relied on for retirement and for estate planning, (ii) unfairly and deceptively carry out business operations with the intent to willfully infringe on SFG's trademarks and improperly leverage their goodwill, and (iii) deprive Counter-Plaintiffs of the contractual benefits that were negotiated and owed.

3. In 2022, SFG launched its innovative flagship life insurance product, LifeNotes. LifeNotes uses a proprietary pooled trust structure that competitors in the industry have yet to recreate (the "LifeNotes trust"). SFG serves as the third-party administrator[1] and servicer of LifeNotes plans, and Capaxa serves as the trustee of the LifeNotes trust.

4. To enhance its marketing efforts for LifeNotes and other types of plans sold by

---

[1] As third-party administrator of the LifeNotes trust, SFG handles day-to-day operations related to LifeNotes plans such as recordkeeping, compliance, and processing transactions.

19

Counter-Plaintiffs,[2] Counter-Plaintiffs SFG and Capaxa entered into an agreement in April 2023 with Counter-Defendant Modern Capital (the "2023 APA"), executed by Modern Capital's principal, Counter-Defendant Millman. This joint marketing arrangement, commonplace in the industry, provided that Counter-Defendants Millman and Modern Capital, as brokers in the life insurance industry, would sell and market LifeNotes on behalf of Counter-Plaintiffs.

5.      Under the 2023 APA, Counter-Defendants would solicit clients to move their pre-existing legacy life insurance policies into the LifeNotes trust and to purchase new policies from insurance carriers that would start in the LifeNotes trust. The resulting commissions paid by insurance carriers that issued the policies would be shared by Counter-Plaintiffs and Counter-Defendants based on a variable split determined by a number of factors centering around the extent to which each party assisted with the sale.

6.      However, in May 2025, Counter-Plaintiffs discovered that Counter-Defendants had engaged in an over-two-year-long pattern of fraudulently misrepresenting the capabilities of the LifeNotes product, selling their own sham version of LifeNotes using SFG's proprietary pooled trust structure and trademarks, leveraging Counter-Plaintiffs' then-impeccable reputation in the industry, stealing commissions owed to Counter-Plaintiffs under the 2023 APA, and causing clients to purchase financially unworkable and fraudulent plans.

7.      Despite receiving immediate cease-and-desist letters throughout the summer and fall of 2025, Counter-Defendants continued their scheme, concealing and withholding from Counter-Plaintiffs commissions and revenue from undisclosed sales of LifeNotes and other SFG products. Counter-Plaintiffs also were deprived of business opportunities they would have otherwise accrued from relationships that were harmed from their association with Counter-

---

[2] In addition to LifeNotes, SFG sells other types of SERP plans, including traditional split-dollar plans.

Defendants. Moreover, Counter-Defendants' fraudulent misrepresentation of LifeNotes and marketing of a defective life insurance product that improperly carries Counter-Plaintiffs' product branding has resulted in a loss of goodwill towards Counter-Plaintiffs' products and injury to their reputation in the industry.

## THE PARTIES

8. Counter-Plaintiff SFG Executive Benefits LLC d/b/a Stearns Financial Group, LLC ("SFG") is a Wyoming limited liability company with its principal place of business in Cincinnati, Ohio. SFG is a wholly owned subsidiary of Defendant Infineo Holdings, Inc. ("Infineo"), a Delaware corporation.

9. Counter-Plaintiff Capaxa, LLC ("Capaxa") is a Wyoming limited liability company with its principal place of business in Cincinnati, Ohio. Capaxa is a wholly owned subsidiary of Infineo. Capaxa serves as the trustee of the LifeNotes trust.

10. On information and belief, Counter-Defendant Ryan Millman is a natural person residing in the Commonwealth of Massachusetts. Millman is the President and Chief Executive Officer of Counter-Defendant Modern Capital and a Principal and Founder of Counter-Defendant Acumen.

11. On information and belief, Counter-Defendant Modern Capital Executive Solutions, Inc. ("Modern Capital") is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

12. On information and belief, Counter-Defendant Acumen Financial Advantage, LLC ("Acumen") is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. Acumen is jointly owned by ABRM LLC, a Delaware limited liability company with its principal place of business in Boston, Massachusetts, and Hinkle Insurance Services, a California corporation with its principal place of business in Encinitas, California. ABRM LLC is

21

a subsidiary of Counter-Defendant Modern Capital.

13. On information and belief, Counter-Defendant Scott Hinkle is a natural person residing in the state of California. Hinkle is a Principal and Founder of Counter-Defendant Acumen, and a Principal and Co-Founder of Hinkle Insurance Services.

14. On information and belief, Counter-Defendant Baycrest Consultants, LLC ("Baycrest") is a Florida limited liability company with its principal place of business in Fort Myers, Florida.

15. As alleged more fully below, Counter-Defendants conspired together and participated in a scheme to defraud Counter-Plaintiffs as well as third parties who purchased fraudulent SERPs.

## JURISDICTION AND VENUE

16. These Counterclaims arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d); Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and 15 U.S.C. § 1114(1); and statutory and common law of the State of Ohio and the Commonwealth of Massachusetts. This Court has subject-matter jurisdiction over the federal claims pursuant to 18 U.S.C. § 1964, 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a).

17. This is a civil action seeking damages in excess of the $75,000 jurisdictional threshold of this Court and is an action between citizens of two or more states pursuant to 28 U.S.C. § 1332. The Court has supplemental jurisdiction over non-federal claims that "relate to claims in the action within the original jurisdiction that they form part of the same case or controversy" pursuant to 28 U.S.C. § 1367(a).

18. Venue is proper in this District under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because: (i) a substantial part of the events or omissions giving rise to the claims set forth herein

22

occurred in, and were directed toward, this District; (ii) Counter-Plaintiffs SFG and Capaxa are headquartered in this District and have suffered injury here; and (iii) Counter-Defendants transacted their affairs involving Counter-Plaintiffs in this District.

19. Venue is also proper pursuant to the choice of venue provision set forth in the parties' 2023 Advisor Producer Agreement (the "2023 APA"), which binds all Counter-Plaintiffs and all Counter-Defendants.[3] The Agreement provides that claims shall be brought in: "any court of competent jurisdiction located in Cincinnati, Ohio." 2023 APA § 8. Further, venue is proper in this district for purposes of these counterclaims to the Complaint by Counter-Defendants' choice of this forum for filing their Complaint.

20. This Court has personal jurisdiction over the parties to this dispute because Counter-Defendants' acts and omissions giving rise to this dispute were aimed at and caused harm to Counter-Plaintiffs in the state of Ohio. In addition, the claims arise from an agreement which is a "legally binding contract under the internal laws of Ohio." 2023 APA § 10.

21. This Court also has personal jurisdiction over the parties hereto because, pursuant to the 2023 APA, the parties "knowingly and irrevocably" submitted to this Court's jurisdiction, 2023 APA § 8, and because the parties transacted business in the state of Ohio. Further, Counter-Defendants Millman, Modern Capital, and Acumen voluntarily filed their Complaint, to which these Counterclaims are directed, in this Court.

---

[3] The 2023 APA was executed by SFG, Capaxa, and Millman on behalf of Modern Capital. Counter-Defendants Hinkle, Acumen, and Baycrest are bound by the 2023 APA as owners, employees, agents, subsidiaries, affiliates, assigns, or delegates of Millman and Modern Capital. *See* 2023 APA, attached hereto as Exhibit B.

## FACTUAL BACKGROUND

### I.     SFG, CAPAXA, AND THE LIFENOTES TRUST

22.     Founded in 1971, SFG is a financial services company that designs, implements, and services supplemental benefit plans and retention incentives for non-profit executives, including credit union executives. Amidst developments in the tax code and National Credit Union Administration guidelines, SFG pioneered the expansion of collateral assignment split-dollar plans ("CASD" or "split-dollar plans"), a type of SERP based upon employer-sponsored life insurance plans that also provide retirement income for the executive.

23.     Non-profit organizations offer SERPs to competitively attract, retain, and reward key executives by providing benefits above qualified plan (*i.e.*, ERISA) limits. Under these plans, the employer advances funds to pay premiums on an executive employee's life insurance policy, which the employee can withdraw or borrow against upon retirement. The employer typically recovers its premium outlay from the policy's death benefit, though normally many years later. The plans, which can grow as the cash value is invested, result in tax-free benefits for the executive if structured in a manner compliant with IRS rules.

24.     The success of these arrangements hinges on the financial performance of insurance carriers, which typically invest the premiums in indexed funds, fixed-income securities, and other financial instruments to generate returns and build policy cash value. Under traditional split-dollar plans, each plan is executed on a one-to-one basis, whereby an employer makes a loan to an individual executive, the executive uses the loan to purchase one or more life insurance policies, and benefits to the executive and recoupment of the employer's loan hinge on the investment performance of that plan alone. However, because these arrangements are often tied to the life span of the executive, they create commitments that can tie up the employer's assets (*i.e.*, in the form of the loan used to purchase the policy(ies)) for years if not decades.

24

25.     In 2022, SFG developed its innovative LifeNotes product, a system of administering split-dollar plans using a distinctive pooled-trust structure. The trust pools assets underlying split-dollar plans and administers the plans to the benefit of both the executive and the employer who provided the loan for the original split-dollar plan. To date, the LifeNotes product has been most commonly purchased by credit unions for their executive employees.

26.     SFG provides two offerings associated with the LifeNotes trust. In one offering, a legacy plan previously purchased for an executive is moved into the LifeNotes trust. Employer organizations originally purchased these traditional split-dollar plans, often many years ago, without any consideration of or intent to utilize the LifeNotes trust. To move the plan, the employer organizations sell the loan (whose proceeds were used to purchase the executive's life insurance policy) to the LifeNotes trust, in exchange for a guaranteed repayment that is not dependent on the performance of an individual plan or on unknowable lifespan of the insured executive. This allows employer organizations to recoup the loan values at an earlier time.

27.     SFG's second offering allows an employer to buy a new plan for its executive with the intent of utilizing the LifeNotes trust from the outset. The policy asset is assigned to the trust when the employer buys the policy, immediately clearing the employer of the burden of a loan and freeing up capital for the employer-non-profit. Furthermore, because the assignment to the LifeNotes trust occurs at the outset, the terms at which this can be done are much more favorable for the employer and the executive than if moved several years after the origination of the plan.

28.     In essence, LifeNotes allows employer non-profits to offer a given benefits package to an executive at a lower cost or, alternatively, an enhanced benefits package at the same cost as compared to traditional plans. SFG is able to offer these products because the pooling of the policies in the trust enables it to benefit from the diversified performance of the policies and the

timing of aggregated death benefits. SFG and Capaxa earn fees from servicing the plans and managing the assets in the trust and via commissions earned on the sale of new plans which are paid by the insurance carriers.

29. The LifeNotes trust's proprietary structure is designed to enhance liquidity for employers (SFG's "clients"), which employers may use to attract new executives or reward current ones, and to reduce risk for the employee executives. SFG's LifeNotes product quickly became popular with clients who recognized its advantages over traditional split-dollar plans, and garnered respect in the industry amongst even SFG's competitors as a unique and sophisticated offering.[4] On information and belief, no other competitor has yet been able to develop a product that offers benefits similar to the LifeNotes trust.

30. In conjunction with developing LifeNotes, SFG has used and managed the unique trademarks "CAPAXA" and "LIFENOTES." These marks are also the subject of federal trademark registrations, specifically: (1) CAPAXA for financial and investment services, U.S. Trademark Registration Number 6,371,310, claiming a date of first use anywhere and in United States commerce since at least as early as March 1, 2014, and (2) LIFENOTES for financial and investment services, U.S. Trademark Registration Number 7,751,253, claiming a date of first use anywhere and in United States commerce since at least as early as May 31, 2022.

---

[4] B. Samuelson, The Life Product Review, *The Securitization Frontier* (July 24, 2025), https://lifeproductreview.com/2025/07/24/435-the-securitization-frontier/; CU Today, *Executive Pay is Evolving: Why Credit Unions are Rethinking Compensation and Facing Tough Choices* (Sept. 18, 2025), https://www.cutoday.info/THE-feature/Executive-Pay-Is-Evolving-Why-Credit-Unions-Are-Rethinking-Compensation-And-Facing-Tough-Choices.

| Trademark | U.S. Reg. No. | Services | Date of first use (at least as early as) |
|---|---|---|---|
| CAPAXA | 6,371,310 | Class 36: Providing information in the field of employee financial benefit plans; providing information in the field of executive financial benefit plans; administration of employee benefit plans concerning insurance and finance; administration of executive benefit plans concerning insurance and finance; financial administration of retirement plans; financial retirement plan consulting services; administration of retention, succession, recruitment, and retirement plans concerning insurance and finance for employees and executives; financial information and advisory services; financial planning and investment advisory services | Mar. 1, 2014 |
| LIFENOTES | 7,751,253 | Class 36: Financial asset management; financial investment trust administration; capital investment services; investment advice; consultancy of capital investment; financial planning and investment advisory services; management of securities portfolios; providing financial services with respect to securities and other financial instruments and products, namely, money management services; financial investment in the field of pooled life insurance; financial management in the field of pooled life insurance; financial investment in the field of collateral split-dollar finance; financial management in the field of collateral split-dollar finance; custodial services, namely, financial trust operations; financial trust administration; financial trust planning; financial trust operations; trust services, namely, investment and trust company services | May 31, 2022 |

31. Collectively, these common law and federally registered trademark rights are referred to as the "LIFENOTES MARKS."

32. As a result of SFG's use and promotion of the LIFENOTES MARKS in interstate commerce in connection with its distinctive and innovative SERP products, SFG has developed substantial and valuable goodwill in the LIFENOTES MARKS. Consumers have come to associate the LIFENOTES MARKS with SFG. This is particularly the case with credit unions and their executives, among whom the product has rapidly grown in popularity.

33. The marks are inherently distinctive in the minds of consumers through Counter-Plaintiffs' successful and widespread marketing of CAPAXA and LIFENOTES, including website advertisements, podcast appearances, and news reporting.

## II. COUNTER-PLAINTIFFS' JOINT MARKETING ARRANGEMENT WITH MILLMAN AND HIS AFFILIATES

34. In 2022, SFG and Capaxa were in the final stages of developing LifeNotes. In addition to having an in-house sales team, SFG and Capaxa (like many in the industry) also worked with others to market its products. These external marketing partners (referred to as "producers"), who often have existing business relationships with employer institutions to service executive compensation plans, can refer clients to plans to be serviced by SFG through the LifeNotes trust.

35. Specifically, producer partners market SFG products by: (1) referring prospective clients to SFG to assign their existing plans to the LifeNotes trust to be administered by the trust; and/or (2) working with SFG to sell new plans that are then assigned to the LifeNotes trust from the outset, by which non-profits and employee executives reap compounded benefits from the start. Critically, the two offerings are complementary, as an employer non-profit can recoup capital from transferred plans and reinvest the capital to purchase new plans to attract or retain executive talent. For either type of transaction, SFG would share the commissions from the sale of any new plans

28

with the producer who brought in the client.

36.     Among others, SFG and Capaxa contracted with Counter-Defendant Millman, with whom it had previously worked on marketing traditional split-dollar plans, for this purpose. At this time, Millman marketed split-dollar plans through his company Modern Capital.

37.     On or about August 8, 2022, Capaxa and Counter-Defendants Millman[5] and Modern Capital executed a Non-Disclosure Agreement (the "2022 NDA," attached hereto as **Exhibit A**) in order to facilitate the exchange of confidential and proprietary information. The agreement also binds SFG as an agent, affiliate, and/or assign of Capaxa, as well as Acumen and Hinkle beginning in approximately 2024 as Millman's and Modern Capital's agents, subsidiaries, affiliates, successors, and/or assigns.[6]

38.     The 2022 NDA was necessary to protect SFG's and Capaxa's confidential information contained in plan implementation design documents, client lists, trust financial and governance documents, and marketing materials, including those for the LifeNotes trust.

39.     The 2022 NDA forbade Millman and Modern Capital from misappropriating SFG's and Capaxa's intellectual property, such as using SFG's and Capaxa's materials for any purpose other than the agreed-upon joint marketing arrangement:

> Producer recognizes and agrees to protect and to not disseminate, reconstitute, reverse engineer, devise substantially similar offerings in form or effect, derive alternates from, or alter Originator [(i.e., Capaxa)] Property or Originator Products ("Misappropriation"). For purposes of this agreement Misappropriation includes but is not limited to any and all use of Originator Property or Originator Products outside of any disclosed Business Opportunities or with any Client without Originator knowledge and written consent.

---

[5] Millman signed the 2022 NDA in both his capacity as "CEO/President" of Modern Capital and in his individual capacity. *See* Ex. A at 4.

[6] The 2022 NDA binds "all owners, employees, agents, subsidiaries, and affiliates" of Millman, and "all owners, employees, subsidiaries, agents and affiliates" of Capaxa.

Ex. A § 2. The 2022 NDA further set forth:

> In addition to Originator Property, which shall for all purposes hereunder be deemed "Confidential Information," each Party hereby agrees to use only as contemplated herein for the joint pursuit of Business Opportunities any non-public information provided by the other Party including Client information, including without limitation Originator or Client's copyrighted and other proprietary information, Client data, Client Personal Health Information (PHI), Originator or Client financial data, Originator or Client trade secrets, Originator or Client materials, and Originator plan designs or specifications, software, processes, plans, know-how, lists of Clients and target or prospective Clients, illustrations and related information, designs, data, business relationships, projections, marketing data, marketing strategies, and methods of operation ("Confidential Information"). The Party receiving Confidential Information shall not otherwise use or disclose it[.]

*Id.* § 5.

40.    In executing the 2022 NDA, Capaxa, Millman, and Modern Capital expressly agreed that the 2022 NDA's terms would apply to all their "owners, employees, agents, subsidiaries, and affiliates," and that any party would require any "officers, owners, employees, agents, and advisors" that received confidential information to abide by the 2022 NDA's terms. *Id.* at 1–2.

41.    The 2022 NDA also contained a "Non-Solicitation" provision in which Millman and Modern Capital agreed that:

> Producer shall not, independently or in association with any other than [Capaxa], seek to provide to Clients, or to any member of the Market, services or products of the type or nature or any such that are substantially similar in force or effect as provided by [SFG] at any time during a period of thirty-six (36) months commencing on the later of the start of a Business Opportunity, or last Client contact, or termination of this Agreement.

*Id.* at 2.

42.    Between August 2022 and January 2023, under the protection of the 2022 NDA, SFG and Capaxa shared with Millman and Modern Capital certain confidential and/or proprietary

information relating to the LifeNotes trust, including, among other things, SFG and Capaxa's exhibits and illustrations, SFG's client lists, and financial and legal documents underlying the LifeNotes trust, including private placement memoranda, tax documentation, sample agreements, accounting entries, financial reports and audits, opinion letters from law firms, and compliance reports.

43. On or about February 1, 2023, Counter-Plaintiffs SFG and Capaxa, on the one hand, and Counter-Defendants Millman and Modern Capital, on the other hand, executed an Advisor Producer Agreement (the "2023 APA," attached hereto as **Exhibit B**) documenting additional terms of their joint marketing arrangement, including the split of commissions and client management. Per the 2023 APA, once Millman or Modern Capital marketed any SFG products,[7] including but not limited to plans under the LifeNotes trust, to prospective clients, the marketing activities with that client became a Business Opportunity subject to the 2023 APA's terms. *See* Ex. B §§ 1–2. Specifically:

> In each Business Opportunity, Producer must work in conjunction, jointly, and in sharing revenue in accordance with Schedule A, with SFG and an assigned SFG Representative who participates in all Business Opportunities for educating Clients, Client needs analysis, consulting, Plan Design, presentation, Plan implementation, Plan Finalization, post Business Opportunity service, and/or communication with respect to SFG Products. The level of participation and resulting revenue split can be adjusted between Producer, SFG, and SFG Representative as determined in writing and approved by SFG on a per Business Opportunity basis. Producer must adhere and abide to SFG business policies, practices, procedures, privacy policies, compliance, due diligence, and Client privacy safeguards, directives, and memorandums.

---

[7] These counterclaims refer to any plans sold by either Counter-Plaintiffs or Counter-Defendants from any business opportunity under the 2023 APA as "SFG products." As described above, these may include LifeNotes, as well as other types of SERP plans, including traditional split-dollar plans.

Ex. B § 3.

44. For all Business Opportunities, Millman and Modern Capital were required to truthfully advise SFG whether those opportunities led to the purchase of new plans and disclose to the resulting commissions owed to SFG. Commissions were paid to Millman and Modern Capital by the insurance carrier whose policy was sold, which were in turn required to be split with SFG.

45. For new plans originated and assigned to the LifeNotes trust from the outset arising from this joint marketing arrangement, commissions would be determined by formulas and parameters as defined in the 2023 APA. *See* Ex. B § 4. For existing plans assigned to the LifeNotes trust, smaller fees would be paid to a producer:

> Onboarding a Plan previously sold, solicited by, or implemented by a producer unaffiliated with SFG at the time of the sale into the SFG platform will be subject to consulting fees and administration fees paid by the client.

Ex. B § 4(i).

46. The 2023 APA contained a "Non-Solicitation" clause in which Millman and Modern Capital agreed that they would not, "independently or in association with anyone other than the other Party, seek to provide SFG Products to Clients with open Business Opportunities at any time during a period of twelve (12) months commencing on the later of the cessation or closing of a Business Opportunity, or termination of this Agreement." Ex. B § 6.

47. The 2023 APA contained misappropriation and confidentiality provisions identical to those in the 2022 NDA. *See* Ex. B §§ 2, 5.

48. In executing the 2023 APA, Capaxa, SFG, Millman, and Modern Capital again expressly agreed that the 2023 APA's terms would apply to each party's "owners, employees, agents, subsidiaries, and affiliates," and that any party would require any "officers, owners, employees, agents, and advisors" that received confidential information to abide by the 2023

32

APA's terms. Ex. B at 1, 4.

49. The parties also agreed that the terms of the 2023 APA would "be binding upon and inure to the benefit of the permitted successors and permitted assigns of each Party, but Producer may not assign any of its rights or delegate any of its duties hereunder without the written consent of SFG." Ex. B § 10.

50. Hinkle was not initially a party to the 2023 APA, but began working with Millman in 2024, doing business as Acumen Insurance Solutions, which, on information and belief, was affiliated with Modern Capital but was not a formal legal entity. Millman, Hinkle, and another business partner formally formed Acumen Financial Advantage LLC ("Acumen"), a Delaware company, in December 2024. On information and belief, at all relevant times, Hinkle, Acumen Insurance Solutions, and Acumen directly relied on and profited from the rights and benefits afforded under the 2022 NDA and 2023 APA. Hinkle, Acumen Insurance Solutions, and Acumen Financial Advantage are subject to the above-referenced agreements as they served as either employees, agents, subsidiaries, affiliates, successors, and/or assigns of Millman and/or Modern Capital, marketing and selling SFG's products.

III.  **COUNTER-DEFENDANTS' SCHEME TO STEAL COMMISSIONS FROM COUNTER-PLAINTIFFS OWED TO THEM UNDER THE 2023 APA**

51. Throughout the parties' joint marketing arrangement and continuing through the present, Counter-Defendants devised a scheme and artifice to defraud Counter-Plaintiffs of money and property, including commissions owed on sales of plans that referenced or relied upon Counter-Plaintiffs, and to defraud non-profit organization clients and executive employee participants who purchased plans from Counter-Defendants. Counter-Defendants' scheme operated as follows:

52. On information and belief, beginning in approximately February 2023 and May

33

2025, Counter-Defendants Millman and Modern Capital, and subsequently Hinkle, Acumen, and Baycrest, marketed SFG products, including LIFENOTES, to numerous prospective clients using confidential and proprietary information provided by SFG.

53.     Between November 2022 and May 2025, Counter-Defendants Millman, Modern Capital, and Acumen requested from SFG materials containing confidential information, including due diligence documents for the LifeNotes trust, SFG's client lists, SFG's modeling illustrations, and other client materials. Millman and Modern Capital stated they would use them for marketing, as contemplated and agreed upon in the 2022 NDA and 2023 APA. Millman, Modern Capital, and later, Hinkle and Acumen, however, had no intention of upholding their obligations under the contracts.

54.     Initially, Millman and Modern Capital presented information provided and prepared by SFG. SFG's involvement in joint marketing to prospective clients was inherently required, not only because SFG was the sole party with the expertise to prepare illustrations for potential clients, but also because any successful sales would result in plan assets being assigned to the LifeNotes trust, creating legal obligations for Counter-Plaintiffs SFG and Capaxa. Because SFG would provide confidential plan design information in these bespoke marketing materials, SFG also required Millman and Modern Capital, and later, Hinkle and Acumen, to direct prospective clients who were to receive such materials to sign a non-disclosure agreement with SFG.

55.     Millman was successful in signing on over 171 clients with existing policies who wished to assign their policies to the LifeNotes trust. Millman was paid $178,918.72 in fees under the terms of the 2023 APA.

56.     Millman, Modern Capital, Acumen, and Hinkle, however, represented to Counter-

34

Plaintiffs that despite pitching *new* plans to 88 prospective clients, not a single prospective client signed on to purchase new plans. Thus, despite preparing and providing Millman, Modern Capital, Acumen, and Hinkle with bespoke marketing materials for at least 88 clients, Counter-Plaintiffs did not receive any commissions from any sales of new plans despite the expectations that employers would buy new plans after gaining liquidity from moving existing plans into the Trust.

57. Counter-Plaintiffs would later discover that Millman, Hinkle, Acumen, and Modern Capital, misappropriating the LIFENOTES MARKS, *had* originated at least 17 new plans that qualified as SFG products under the applicable contracts. Through intentional omissions and misrepresentations, Millman, Hinkle, Acumen, and Modern Capital willfully hid these sales from Counter-Plaintiffs, collected the commissions from the insurance carriers, and kept the entire amount instead of splitting it with Counter-Plaintiffs as required under the 2023 APA.

IV. **COUNTER-DEFENDANTS' MISAPPROPRIATION OF COUNTER-PLAINTIFFS' CONFIDENTIAL INFORMATION TO DEFRAUD CONSUMERS**

A. **Millman, Modern Capital, and Acumen Fail to Secure NDAs With Clients in Violation of the 2023 APA**

58. For each prospective client, Millman, Modern Capital, and later Hinkle and Acumen, received detailed confidential information from SFG, including spreadsheets and illustrations of potential benefits of SFG's products, and due diligence information from Capaxa about the LifeNotes trust.

59. Modern Capital and Acumen, through Millman and others, made frequent and numerous requests for illustrations from SFG, which caused SFG to expend significant resources and time creating marketing materials that Millman, Modern Capital, and later Hinkle and Acumen, could present to prospective clients. SFG expressed that these requests placed a significant strain on its analysts. During the relevant period, Millman, Modern Capital, and Acumen requested detailed plan illustrations for over 88 prospective client organizations.

35

60.     Millman also repeatedly requested access to SFG's detailed analytical models in an attempt to gain access to even more confidential information to further his scheme. To protect the proprietary design of the LifeNotes product, SFG repeatedly refused Millman's requests.

61.     Initially, Millman, Hinkle, Modern Capital, and Acumen directed prospective clients to sign an NDA with SFG in order to receive customized marketing materials that reflected detailed and proprietary plan design information and detailed due diligence information about the trust from Capaxa. This practice was in accordance with SFG confidentiality requirements. However, since December 23, 2024, Millman, Modern Capital, and Acumen have not directed any prospective clients to SFG for the execution of NDAs, while continuing to disclose to these clients confidential information that was initially provided to Millman, Modern Capital, and Acumen for other purposes.

62.     On information and belief, even where Millman did provide NDAs to SFG in order to gain access to confidential and proprietary SFG information, Millman knowingly and intentionally provided at least eight NDAs that were not properly executed. None of the NDAs were signed either directly by a client representative or by using an SFG-approved and legally sound method that could be authenticated, such as DocuSign. In other words, Millman and Acumen provided Counter-Plaintiffs with NDAs that did not contain legitimate signatures.

**B.      Millman, Modern Capital, Hinkle, Acumen, and Baycrest Secretly Market Fraudulent SFG Products**

63.     Millman devised a scheme to use SFG's marketing materials and the CAPAXA and the LIFENOTES trademarks in order to induce clients to buy new life insurance policies and other products, on which he would receive significant commissions that he then hid from SFG.

64.     More specifically, Millman, Modern Capital, Hinkle, and Acumen sold plans to employers and executives using marketing materials initially prepared by SFG about or

36

referencing CAPAXA, LIFENOTES, and the LifeNotes trust, but then altering them to lead potential clients to believe that they were being sold a product where their plan would go into the LifeNotes trust at a later date.

65. On information and belief, beginning as early as December 2023, Millman and Modern Capital began offering to clients a "solution" in which "[the employer] [sells] its *[sic]* interest to a third party trust (Capaxa) designed to buy split dollar plans, in year 6, shortening the tail from life expectancy to 15 years." Counter-Plaintiffs were never made aware of this offering and would not have approved it.

66. On information and belief, in or around May or June of 2024, Millman and Modern Capital began calling this same offering "MAXCAP." Millman and Modern Capital claimed that under a MAXCAP plan, a client's policy would be moved into the LifeNotes trust (which was sometimes erroneously referred to as the "Capaxa pool") five years after purchasing it via Millman and Modern Capital. On the initial purchase of the policy, Millman and Modern Capital would receive substantial commissions from the insurance carrier for originating a new plan, which they did not intend to split with Counter-Plaintiffs despite the LifeNotes trust being a core component of MAXCAP.

67. For example, on information and belief, Modern Capital marketed MAXCAP in a deck titled "Introduction to MaxCap," stated the following:

68. Millman recruited Counter-Defendant Baycrest, who was involved in the sale of Millman's and Modern Capital's "MAXCAP" plan. On the last slide of the above-referenced "Introduction to MaxCap" deck, an individual named Eliot Sokalsky (listed as the agent of record for Baycrest in its corporate registration)[8] is listed alongside Millman as a point of contact for questions about the presentation.

---

[8] *Florida Department of State Division of Corporations*, Sunbiz.org, N.D. https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResults?InquiryType=EntityName&InquiryDirectionTyp e=PreviousRecord&SearchTerm=BAYDE%2C%20INC.&SearchNameOrder=BAYCRESTCONSULTING%20L19 0000079381&ListNameOrder=BAYCRESTCONSULTANTS%20L240000873350&Detail=FL.DOS.Corporations.S hared.Contracts.FilingRecord.



69. On information and belief, by no later than August 2024, Millman had recruited Acumen Insurance Solutions, a company owned by Counter-Defendant Scott Hinkle, to market and sell the same plan, promising that "[a]t the end of year 5 the Organization's interest in the split-dollar plan is moved to Capaxa for a 0% note, thus capping the duration to 15 years."

70. On December 20, 2024, Hinkle and Millman formed Counter-Defendant company, Acumen. By March 2025, Acumen and its owners, Hinkle and Millman, were selling the same scheme to clients, promising that the employer could "[sell] [the] note after 5 years to Capaxa using the 10 year cap at 0% (total duration of 15 years)."

71. On information and belief, Millman and Modern Capital initially began marketing MAXCAP, CAPAXA, and LIFENOTES to healthcare institution clients. Millman and Modern Capital later switched their focus to advertising MAXCAP and the "Capaxa buyout" to credit unions.

72. On information and belief, Millman, Modern Capital, Hinkle, or Acumen attempted to sell split-dollar plans to over twenty clients that would allegedly enter the "Capaxa trust," "Capaxa pool," or the "LifeNotes trust" after five years in a separate account. Counter-Plaintiffs

were never made aware of these presentations or representations of LIFENOTES and the "Capaxa pool" by any of the Counter-Defendants.

73. For example, a Modern Capital–branded deck dated December 12, 2023 prepared for a credit-union-client explicitly states, as seen below, that "[t]he [Credit Union] is selling it's [*sic*] interest to a third party trust (Capaxa) . . . in year 6":





74. Similar statements appear on a Modern Capital–branded deck dated October 10, 2024 prepared for a credit-union-client:



75. This time on an Acumen-branded deck, a MAXCAP presentation for an executive at a credit union dated May 9, 2025 stated the following:

76.     Counter-Defendants' legal agreements with clients contained the same falsehoods. For example, a split-dollar agreement fully executed by an employer and its executive, whose names are redacted in the image below, and naming "Modern Capital Executive Solutions" as recordkeeper states the following:

---

**EXHIBIT 3**

## STATEMENT OF INTENT

███████████████████████ and ██████████ (the "Employee") are parties to the attached ██████████████████ Split Dollar Agreement.

The parties recognize the benefits of the Capaxa program and intend to transfer all or part of their rights under the Agreement to the Capaxa pool on or around the fifth anniversary of the effective date of the Agreement. Neither party is making an irrevocable decision by signing this statement.

_____

**Signatures**

---

42

77.     The same "statement of intent" referencing the "Capaxa program" can be found on the first page of another fully executed "consent agreement" dated March 31, 2025, between Acumen, a credit union, and its executive, whose names are redacted in the image below. On information and belief, as part of the MAXCAP scheme, Millman, Modern Capital, Acumen, and Hinkle required employers and their executives to sign consent agreements, which would allow Counter-Defendants to move an executive's split-dollar plan to the LifeNotes trust at the end of five years. This agreement was necessary to further Counter-Defendants' scheme, as it allowed Millman to get approval of the arrangement with the current board of the employer so the arrangement did not have to be approved again five years later, when the policy would allegedly go into the LifeNotes trust.

## CONSENT AGREEMENT

███████████████████████████ and ████████ are parties to the Split Dollar Agreement, effective as of January 1, 2025.

The parties recognize the benefits of the Capaxa program and intend to transfer all or part of their rights under the agreement to the Capaxa trust. ████ hereby consents to █████████████████████ transferring its rights after the fifth anniversary of the effective date of the agreement, so long as his rights under the agreement are not adversely affected. Similarly, ███████████████ ████████ hereby consents to ████ transferring his rights under the agreement once they are fully vested.

Each party grants consent to the other party as described above, however neither party is making any other irrevocable decision by signing this agreement.

_Signatures_

43

78. On information and belief, using SFG's marketing materials and designs that Millman, Modern Capital, and Acumen had altered, Millman, Modern Capital, Hinkle and Acumen represented to clients that some portion of the clients' policy funds would rest in a "side account" for the first five years, and after five years, their entire policy asset would enter the LifeNotes trust. As a result, clients would not grow suspicious at the lack of concurrent agreements with Capaxa regarding LifeNotes, and would not contact SFG or Capaxa with any questions. Millman and Acumen's plans were, in reality, unworkable because SFG and Capaxa, unaware of the transactions, did not agree to move these plans into the LifeNotes trust. And even if SFG and Capaxa had been informed about these sales, they would not be able to meet the exaggerated and unrealistic terms and obligations Millman, Hinkle, Acumen, and Modern Capital promised to those clients.

79. To facilitate the transfer of the clients' assets to these "side accounts," Millman provided wire instructions to accounts that were, on information and belief, controlled by him.

80. On information and belief, while the clients' policy assets remained in Millman's side account, he kept the interest the account accumulated for himself, thereby depriving the client of the benefit of the growth of their asset they would otherwise have had their asset been in the LifeNotes trust from the outset.

81. To facilitate his scheme, Millman, Hinkle, Acumen, and Modern Capital even recommended hand-picked counsel for clients who would not raise red flags and who would instead allow the transactions to go through. For example, on information and belief, Millman, Hinkle, Acumen, and Modern Capital recommended specific law firms to clients but controlled all communications with the law firm and instructed them on how to draft the agreements. The law

firms they recommended, though formally retained by the client, only spoke with Millman or Hinkle.

82.     Millman held out, and clients believed that they were buying, plans that allowed them to take advantage of the benefits of the LifeNotes trust. But due to Millman, Modern Capital, Hinkle, and Acumen's misrepresentations and lies, clients were actually getting something entirely different—a plan with fewer benefits, more risk, and undisclosed tax consequences. Through his misleading statements, misrepresentations, and omissions, Millman, Modern Capital, Hinkle, and Acumen were able to deprive clients of the substantial interest their assets accumulated.

## V.     COUNTER-PLAINTIFFS DISCOVER AND INVESTIGATE MILLMAN'S SCHEME AND DEMAND THAT HE CEASE AND DESIST

83.     Although Millman and Modern Capital had been working in a joint marketing arrangement with SFG since August 2022, and also with Hinkle and Acumen since December 2024, Millman, Modern Capital, Hinkle, and Acumen have not shared with Counter-Plaintiffs any commissions or revenue from any new originations of SFG products. While Millman, Modern Capital, Hinkle, and Acumen have successfully moved many existing life insurance plans to the LifeNotes trust, these earn them much smaller fees in comparison to the commissions earned on new issuances of life insurance plans. Millman claims that he has sold *zero* new plans for SFG products during the entirety of their working relationship. In reality, Millman has succeeded in selling, on information and belief, at least 17 new plans, which he has hidden by repeatedly misrepresenting or omitting reporting about his sales of SFG products.

84.     For example, in or around March 2025, SFG's Director of Business Development was alerted by a competitor's former employee that Millman and Counter-Defendant Hinkle, working on behalf of Counter-Defendant Acumen, had supposedly completed the sales of three new LifeNotes plans with Client A, a credit union located in Utah. This competitor had presented

45

competing products to Client A at the same time that Millman and Hinkle had done so, and had been told that Client A had instead decided to go with Millman and Hinkle at Acumen because of the benefits of LifeNotes that they were offering.

85. SFG's Director of Business Development telephoned Millman in March 2025 to ask if what he had heard was true. During this call, Millman confirmed presenting LifeNotes to Client A, but claimed that Client A had declined to move forward with any SFG products because, according to Millman, the board of Client A thought the LifeNotes product was too new and had opted for a traditional split-dollar plan.

86. Unbeknownst to SFG, Client A *had* decided to purchase new policies with the intent of utilizing the LifeNotes trust, although the plan Millman and Hinkle presented did not reflect a LIFENOTES plan that actually worked. On materials branded with "Acumen Insurance Solutions," Millman and Hinkle provided documentation for plans that included the purchase of a new policy and a "Capaxa Buyout" after five years, thereby representing that the plans would be implemented using the LifeNotes trust and, after five years, become LifeNotes trust assets. As described above, this plan structure was not approved by SFG, and did not actually deliver the benefits Millman, Hinkle and Acumen advertised. Client A executed plan agreements in October 2024, which contained the language:

> The parties recognize the benefits of the Capaxa program and intend to transfer all or part of their rights under the Agreement to the Capaxa pool on or around the fifth anniversary of the effective date of the Agreement.

87. On information and belief, Millman, Hinkle, and Acumen split commissions for the sale of policies to Client A with a financial services firm that had acted as a referral partner in the transaction but did not share any commissions for the sale of policies to Client A with Counter-Plaintiffs as required under the 2023 APA.

46

88.     Despite Millman, Hinkle, and Acumen's representation, no SFG product permitted an intentionally delayed assignment of policies to the LifeNotes trust. This initial time period was critical to the investment growth that allowed a LifeNotes plan to provide the promised benefit levels, and SFG would not have offered the plans that Millman, Hinkle, and Acumen presented because they were not financially sound. On September 9, 2025, a representative of Client A informed SFG via phone call that Client A believed Millman and Hinkle worked for SFG when they were marketing and sold Client A new policies. Client A was induced into this misunderstanding, because Millman and Hinkle referred to the CAPAXA trademark and offered a "Capaxa buyout" of Client A's policies after five years, as depicted in the slide below, which Millman and Hinkle presented to Client A:



89.     Millman and Hinkle conducted the same scheme in and around June 2025 for an executive at Client B, at a Colorado-based credit union. They sold to Client B a new policy from a company other than SFG while promising that the executive could move his policy into the Capaxa pool at the end of year five. As with the misrepresentations made and plans sold to executives at Client A, Counter-Plaintiffs were unaware of, and did not approve or authorize, this marketing and transaction and they would not have sanctioned it.

90.     In another example, Counter-Plaintiffs learned that, after successfully moving a client's existing policy into the LifeNotes trust, Millman and Acumen had, without their

knowledge, improperly manipulated the underlying asset. Beginning in September 2024, Millman requested plan design illustrations and other confidential materials to market SFG products, including LifeNotes, for the former CEO of Client C in Indiana. Millman and Acumen presented the SFG-generated materials to the former CEO of Client C to convince her to assign her existing policy to the LifeNotes trust, and he had conversations with her through the last quarter of 2024 and first quarter of 2025.

91.     The former executive of Client C ultimately agreed to and signed a purchase agreement on or about March 31, 2025for the LifeNotes trust to acquire her then-existing policy which had been issued by Minnesota Life Insurance Company ("Minnesota Life"). On information and belief, at this time, Counter-Defendants Millman and Acumen were located in Indiana and sent and caused to be sent from Indiana a DocuSign envelope containing the former executive at Client C's signed purchase agreement contract for the Minnesota Life policy to Counter-Plaintiffs in Ohio.

92.     On information and belief, between April and May 2025, Millman, Hinkle and Acumen subsequently caused that same Minnesota Life policy to be exchanged pursuant to Internal Revenue Code § 1035 to a new policy issued by Columbus Life Insurance Company ("Columbus Life"). They did so solely in order to generate commissions for themselves and without obtaining consent from the LifeNotes trust or its fiduciaries, thereby disregarding the Trust's ownership rights and resulting in approximately $1,000,000 in commissions for Millman, Hinkle, and Acumen. As a result, Counter-Plaintiffs' and the trust's interest in the original policy was unlawfully impaired, and Counter-Plaintiffs suffered financial harm including loss of contractual benefits and potential tax exposure.

93.     Additionally, Counter-Plaintiffs suffered reputational harm because Millman

48

promised the former executive of Client C that "LifeNotes" would provide her with an immediate benefit payment. When Counter-Plaintiffs informed Millman it could not deliver on Millman's promise, it reflected poorly on LIFENOTES and Counter-Plaintiffs.

94. In applying for and obtaining the new Columbus Life policy, Millman, Hinkle, and Acumen misrepresented to Columbus Life that the Minnesota Life policy was free and clear of title and otherwise unencumbered. Millman, Hinkle, and Acumen further misrepresented to the former executive at Client C that she could move the Columbus Life policy into the LifeNotes trust approximately one year later, while simultaneously misrepresenting to Columbus Life that the former executive at Client C would not attempt to transact upon or assign the policy within the following two years.

95. On information and belief, the commission payable on the former executive at Client C's new Columbus Life policy was approximately $1,000,000. However, so that Millman, Hinkle, and Acumen did not have to share this commission with Counter-Plaintiffs as required under the 2023 APA, Millman and Acumen did not disclose this new commission to Counter-Plaintiffs.

96. In his discussions with the former executive of Client C, Millman represented to her that she would be due an immediate benefit of approximately $180,000. On May 29, 2025, Millman sent an email to representatives of Counter-Plaintiffs (located in Texas and Massachusetts) asking Counter-Plaintiffs to secure the former executive at Client C's LifeNotes benefit by switching Counter-Plaintiffs' interest under the purchase agreement contract to the new Columbus Life policy.

97. In a later phone call that same day, Millman asked Counter-Plaintiffs to provide the funds to the former executive at Client C to cover the false promise that he had made her, and

suggested that Counter-Plaintiffs book it as a loan without the former executive at Client C's knowledge. This highly unusual request would be secured a year later, Millman claimed, by moving the Columbus Life policy into the LifeNotes trust. Millman misrepresented to Counter-Plaintiffs that both the former executive at Client C and Columbus Life had requested this arrangement rather than assigning the Columbus Life policy to the LifeNotes trust immediately. Counter-Plaintiffs rejected Millman's request and attempted to reach out to the former executive at Client C immediately to troubleshoot the situation.

98.     Ultimately, Counter-Plaintiffs were able to ensure that the former executive at Client C was taken care of, but as a result of Millman, Hinkle, and Acumen's scheme and misrepresentations, Counter-Plaintiffs were denied commissions of at least $4,500,000.

99.     Alarmed at these signs of Millman's irregular conduct, Counter-Plaintiffs began to audit the plans and implementation statuses for the joint clients and prospective clients Millman had disclosed to SFG. Counter-Plaintiffs asked Millman, Hinkle and Acumen to provide this information, but they refused as to the majority of the information that Counter-Plaintiffs requested. Counter-Plaintiffs reached out to other Millman associates and to clients to verify plan statuses and to ensure the required documentation was in place.

100.    During their investigation, Counter-Plaintiffs uncovered additional instances in which Millman, Modern Capital, Hinkle, and Acumen willfully concealed sales of purported SFG products to clients from SFG and willfully misrepresented what the products were to clients.

101.    In August and September of 2025, Client A worked with an external consultant to conduct a review of the executive benefits plans that Millman and Acumen had sold to them using the LIFENOTES MARKS. The consultant realized that the plans were fundamentally flawed and simply would not work from an accounting perspective. The consultant contacted SFG in

September 2025 to inquire about the irregularities, and explained she had been led to believe that SFG had sanctioned Millman and Acumen's plan proposals given the CAPAXA and LIFENOTES references in the materials used to market the plans. SFG was shocked, and informed the consultant that they had no record of Counter-Defendants selling any plans to Client A.

102. Uncovering another example of Millman's wrongdoing, Counter-Plaintiffs learned that Millman concealed new plans sold to Client D, located in Texas. Millman had informed SFG of his successful sales to Client D in which existing life insurance plans for three executives would be moved into and assigned to the LifeNotes trust.

103. Millman did not inform Counter-Plaintiffs, however, that he also attempted to sell, and did sell, new plans for executives at Client D designed around LIFENOTES so that Client D could increase the retention packages for these executives.

104. Millman and Modern Capital had begun marketing SFG products to Client D in approximately October 2023. Beginning in or around February 2025, Millman began conducting these business discussions as the Principal and Founder of Acumen Financial Advantage.

105. In communications beginning in October 2023, Millman provided presentations, accounting memoranda, draft agreements, and other documentation for a "Capaxa Proposal" or "LifeNotes Pooling Proposal" while discussing and formulating the implementation plan with Client D.

106. In addition to a process whereby existing life insurance plans would be moved into the LifeNotes trust after five years in a "side account," these materials, provided to and discussed with Client D throughout the period (including on or around November 21, 2024, January 6, 2025, and April 10, 2025), expressly proposed additional new plans that would be implemented using the LifeNotes trust and become LifeNotes trust assets. However, Counter-Defendants never

51

informed Counter-Plaintiffs of these potential sales or asked Counter-Plaintiffs for the necessary plan design models to illustrate a proper LIFENOTES plan.

107.    Indeed, the plan structure Millman, Modern Capital, and later Acumen presented to Client D did not actually deliver the benefits they advertised. The accounting tables Millman presented to Client D on Acumen-branded materials contained errors and intentional lies and were created based off materials SFG had previously provided. On information and belief, in those tables, Millman and Acumen simply replaced a few numbers and details, and repeated their fraudulent promise that Client D's policy assets would move into the "Capaxa Life Insurance Pool" at the "[e]nd of year 5."



108.    As with other clients, Millman claimed executives could buy policies from companies other than SFG and he would move plans into the LifeNotes trust after five years, whereas the corresponding actual SFG product was required to originate with the LifeNotes trust assignment from the outset.

109.    Referring to the product as "MAXCAP" rather than "CAPAXA," these manipulations also resulted in plan designs that were not compliant with tax and credit union

regulations or insurance laws.

110. At some point, Millman started referring in these materials to the proposed product as MAXCAP rather than CAPAXA, but clients continued to believe it was a CAPAXA offering. Indeed, in many instances, tables labeled as "MaxCap" plan proposals continued to refer to CAPAXA and LIFENOTES in describing plan implementation.

111. In fact, in the fall of 2025, a former employee at Acumen, who had departed from Acumen in the fall of 2025 and was aware of Millman's marketing of MAXCAP, informed an SFG executive via a phone call that "MaxCap" was used in place of LIFENOTES frequently and that the former employee was under the impression MAXCAP was an interchangeable term for LIFENOTES that Acumen used for marketing purposes.

112. Plan agreements Millman provided to Client D expressly suggested that SFG and Capaxa approved the plan and would be active participants in the transaction, stating:

> The parties recognize the benefits of the Capaxa program and intend to transfer all or part of their rights under the agreements to the Capaxa trust. The Participant hereby consents to the Company transferring its rights after the fifth anniversary of the effective date of the agreements.

113. On information and belief, the agreements containing these representations were drafted by Law Firm A, and later the agreements were transitioned to The New Firm, Ltd., two law firms that Millman referred to Client D in February 2025.

114. When it came time to execute and fund a plan that Client D agreed to purchase, Millman informed Client D in July 2025 that he had new wire instructions. Per these new instructions, an executive at Client D would wire the funds to an account in the name of a Florida entity named Continuation Management LLC. This was a sudden change from the previous wire instructions Millman had provided for a Minnesota IOLTA account held by the law firm Millman and Hinkle used, The New Firm Ltd. Millman represented that this "side account" would generate

zero interest, yet somehow facilitate benefits such as retention payouts for recipients. On information and belief, Continuation Management LLC is an affiliate of Counter-Defendants.

**A.     Millman, Hinkle, Modern Capital and Acumen Routinely Misrepresented to Counter-Plaintiffs That They Were Not Making Sales That Would Require Them to Split Commissions with Counter-Plaintiffs Under the 2023 APA**

115.    Pursuant to the 2023 APA, Millman, Modern Capital, Hinkle, and Acumen were required to disclose any sales that were subject to splitting of commissions with Counter-Plaintiffs.

116.    On or around April 2025, SFG's Senior Director of Strategic Partnerships and Infineo's Director of Business Development spoke with Millman via phone call about methods of increasing sales numbers of new policies. Millman said that he had not sold any new policies after moving clients into the LifeNotes trust. In doing so, he explained that he did not want to pay Counter-Plaintiffs 50% of the commissions, as was required under the 2023 APA.

117.    However, by that time in April 2025, Millman had made at least three sales of new policies to clients after having moved their existing policies into the LifeNotes trust, and had not informed Counter-Plaintiffs of these sales in order to keep the full commissions for himself.

118.    Throughout the course of Millman, Hinkle, Acumen, Modern Capital, and SFG and Capaxa's business relationship under the 2023 APA, from at least February 8, 2023 through May 28, 2025, Millman and SFG analysts had weekly calls, sometimes called "collaboration" calls, "check-ins," or "weekly partnership enhancement calls." During these calls, the parties discussed Millman's progress towards the 2023 APA, and specifically, Millman would update SFG on the clients he was still pursuing for the sale of new plans who had already agreed to move their policies into the LifeNotes trust.

119.    Counter-Defendant Hinkle began to join these weekly calls no later than March 15, 2023 and update SFG on the status of the sales alongside Millman.

54

120.    Hinkle and Millman made repeated misrepresentations and material omissions on these calls, continuing to suggest that they had not made any new sales that were subject to split commission with SFG. For example, Millman and Hinkle sold new life insurance policies to executives at Client A in or around October of 2024, and they sold a new life insurance policy to at least one executive at Client D in or around July 2025. Yet on weekly calls during this time period, however, Millman and Hinkle continued to indicate that they had not made any sales that were subject to split commission with SFG under the terms of the 2023 APA and fraudulently omitted from their updates to SFG that they had in fact made such sales.

121.    Counter-Plaintiffs continue to investigate the extent of Counter-Defendants' actions. On information and belief, Counter-Defendants have deployed their scheme on dozens of additional clients, and have received, in the aggregate, millions of dollars in commissions as a result of their improper marketing of the LIFENOTES MARKS. However, they have defrauded Counter-Plaintiffs by representing that they have made no sales of new policies as a result of this marketing, and they have paid Counter-Plaintiffs no commissions from these sales.

## VI.    COUNTER-DEFENDANTS CONTINUE THEIR SCHEME TO DEFRAUD COUNTER-PLAINTIFFS AND CLIENTS

122.    Even at the beginning of their investigation, it was clear to Counter-Plaintiffs that Counter-Defendants were acting unethically and in violation of the parties' agreements and in violation of federal and state laws.

123.    On or about May 9, 2025, Counter-Plaintiffs discovered Millman and Hinkle were marketing CAPAXA and LIFENOTES products on the Acumen website without Counter-Plaintiffs' knowledge or permission. Counters-Plaintiffs demanded that the references on the Acumen website be removed immediately.

124.    On or about June 2, 2025, Counter-Plaintiffs sent a cease-and-desist letter to

Counter-Defendants Millman, Modern Capital, Hinkle and Acumen terminating their business relationship and ending their right to market SFG products, including LIFENOTES. Millman acknowledged these notices, confirming that "[w]e are ceasing and desisting."

125. On June 13, 2025, Counter-Plaintiffs asked that Millman, Modern Capital, Hinkle, and Acumen refer any clients or potential clients to SFG directly, in order to properly continue their discussions about SFG products.

126. Counter-Plaintiffs' ongoing investigation, however, revealed that Counter-Defendants continue to blatantly disregard the promises they made to Counter-Plaintiffs and act in dishonest and fraudulent ways.

127. In July 2025, Millman's insurance producer license was revoked by the state of South Dakota when one of his employees signed a client's name without permission to make an unauthorized sale of a supplemental retirement plan.

128. Despite Counter-Plaintiffs formally demanding at least six times beginning in June 2025 that Millman, Modern Capital, Hinkle and Acumen cease and desist the solicitation and sale of LIFENOTES, Millman, Hinkle and Acumen continued to market the LifeNotes trust to clients and publicly advertise CAPAXA on Acumen's website until at least November 11, 2025.

129. In September 2025, Counter-Plaintiffs discovered that Millman was also modifying existing LIFENOTES plans by substituting himself as the agent of record for insurance policies in the LifeNotes trust without Counter-Plaintiffs' consent, in an attempt to circumvent Counter-Plaintiffs' detection of his ongoing wrongdoing.

130. Millman, Hinkle, and Acumen also continued to solicit SFG clients on at least three occasions on September 25, 2025, December 1, 2025, and February 9, 2026, with plan proposals whose implementation relied on a third-party trust. LIFENOTES was the only product with a third-

party trust in the market at this time.

131. In addition to the above continued solicitation and sale of LIFENOTES, Counter-Defendant Baycrest also continued to advertise MAXCAP on its website, https://www.baycrestconsultants.com/faq, the Acumen plan that purports to bring an executive's plan into the LifeNotes trust after five years.

132. On information and belief, Michael Scully, a Vice President of marketing at Baycrest, provides ongoing assistance to Acumen and Millman in this scheme, such as the solicitation of the COO of Client E, a country club, in October of 2025.

133. On information and belief, Millman, Hinkle, Modern Capital, and Acumen continued to maintain references to Counter-Plaintiffs' products until at least February 13, 2026. On February 13, 2026, an Acumen employee met with an employee of SFG, informing him that Millman had issued instructions to search all of Acumen's records of sales to clients in which SFG products, including LIFENOTES, CAPAXA, or other related SFG brands, were included in presentations or other materials submitted to those clients, and remove those references to the SFG brands from those presentations and materials. The Acumen employee further stated that there were "a lot" of records that Millman asked him to go through and alter.

134. Millman gave these instructions, knowing that litigation was imminent, in an intentional effort to cover up Counter-Defendants' wrongdoing.

135. These actions by Counter-Defendants have caused, are causing, and are likely to continue causing irreparable harm to the detriment of Counter-Plaintiffs and the CAPAXA and LIFENOTES brand until they are put to a stop.

136. On information and belief, Millman was also making misrepresentations to potential clients that the LifeNotes trust's assets under management were over one billion dollars,

57

a wholly inaccurate and inflated figure that caused competing brokers in the industry to accuse Counter-Plaintiffs of fraudulently misrepresenting the assets under management in the trust in an attempt to lure clients. Millman's misrepresentation of the LifeNotes trust caused harm to Counter-Plaintiffs' reputation in the industry, resulting in lost business deals with at least one industry competitor with whom Counter-Plaintiffs had intended to work.

137. Three industry players informed Counter-Plaintiffs on or around June 2025 that they had previously refused to work with Counter-Plaintiffs, despite Counter-Plaintiffs' outreach to create a business relationship, to market LIFENOTES or in any other capacity because of Millman, Hinkle, Modern Capital, and Acumen's fraudulent misrepresentations of LIFENOTES and marketing of MAXCAP. For example, the industry players were suspicious that Millman was fabricating the potential financial performance of Millman, Modern Capital, Acumen, and Hinkle's MAXCAP plan. The industry players had associated MAXCAP with LIFENOTES due to Millman, Modern Capital, Acumen and Hinkle's misrepresentations and marketing materials for MAXCAP, which claimed clients' policies would go into the "Capaxa pool" or LifeNotes trust after year five.

138. Upon learning of Millman's scheme, Counter-Plaintiffs explained to those industry players that Counter-Plaintiffs had not been aware of Millman, Modern Capital, Acumen, and Hinkle's misrepresentations or marketing of MAXCAP. Since Counter-Plaintiffs discovered Millman's fraud, they have been able to repair relationships with some industry players. However, as a result of Millman, Modern Capital, Acumen, and Hinkle's fraud, Counter-Plaintiffs lost out on business opportunities believed to be worth at least $20,000,000 between April 2023 and August 2025.

139. Millman, however, became anxious about Counter-Plaintiffs catching wind of his

58

scheme far earlier than they did. On February 5, 2025, Millman sent his team at Acumen the following email:

| From: | Ryan Millman |
|---|---|
| To: | Case Design |
| Subject: | Capaxa Requests Moving Forward |
| Date: | Wednesday, February 5, 2025 2:55:14 PM |
| Attachments: | Outlook-A blue and.png |
| Importance: | High |

Hey Team,

Hope all is well! Moving forward, whenever we are requesting a new design from Capaxa, please email me the request (as if I was Capaxa).

From there, I will send it to SFG.

Don't ask me why. Just the new preference of the pool.

Anything currently in process (ex: ██████████████████████), you can continue as is.

Please let me know if you have any questions.

All the best,
Ryan


**Ryan Millman**
Principal/Co-Founder



**FINANCIAL ADVANTAGE**

P  (401) 595-6020
E  rmillman@acumenfa.com
W  acumenfa.com

Schedule Meeting via Calendly

140.     Counter-Plaintiffs were not made aware that Acumen, Millman, and Hinkle would no longer be requesting illustrations, which was the course of dealing that had been followed since the 2023 APA's inception.

141.     After Millman sent this email, he called his associate, another life insurance broker

in the same industry who, until June 2025, worked with Millman to sell SFG products. Millman informed his associate that he told his team to stop requesting illustrations from SFG because "Capaxa may have seen a MaxCap proposal, which could be a problem"—presumably because SFG became suspicious that Millman was misappropriating SFG products to sell MAXCAP. Millman then told his associate that he "used MaxCap to get around giving Capaxa commissions."

142.    Upon information and belief, at least 17 credit unions purchased Modern Capital, Acumen, Millman and Hinkle's "MAXCAP" scheme on the promise that they would have the option at the end of five years to move their policy assets into the "Capaxa pool" or LifeNotes trust. On information and belief, some combination of Modern Capital, Millman, Acumen, and/or Hinkle marketed the same MAXCAP plan to at least 27 other credit unions.

143.    On information and belief, Counter-Defendants' violative conduct is continuing to this day. Despite being instructed to cease and desist in their activities on June 3, 2025, Counter-Defendants have persisted in contacting clients and engaging in similar misrepresentations and unauthorized transactions. These ongoing actions demonstrate a continuing pattern of deceptive practices intended to conceal commissions, mislead credit unions and executives, and improperly represent the ability to assign or transfer life insurance policies into the LifeNotes trust, all in an effort to improperly enrich Counter-Defendants.

## COUNT ONE

### Fraud
### (Against Millman, Hinkle, Modern Capital, and Acumen)

144.    Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

145.    Millman, Hinkle, and their entities, Modern Capital and Acumen, intentionally and willfully misrepresented, concealed, and omitted to Counter-Plaintiffs SFG and Capaxa that they

60

had not made any new sales of life insurance policies that would be subject to split commissions under the 2023 APA.

146. The misrepresentations, concealments, and omissions by Millman, Hinkle, Modern Capital, and Acumen to Capaxa and SFG were material misrepresentations, as, among other things, they led Capaxa and SFG to believe that they were not owed commissions under the 2023 APA, when in fact they were owed commissions for the new sales Millman, Hinkle, Modern Capital, and Acumen made, and they caused Counter-Plaintiffs to continue working with Millman, Hinkle, Modern Capital, and Acumen, and permitting access to and use of SFG and Capaxa's confidential materials and the LIFENOTES MARKS.

147. Millman, Hinkle, Modern Capital, and Acumen made these material misrepresentations, concealments, and omissions falsely, with knowledge of their falsity.

148. Millman, Hinkle, Modern Capital, and Acumen made these material misrepresentations, concealments, and omissions intentionally in order to induce SFG and Capaxa to rely on the misrepresentations so that Millman, Hinkle, and their entities Modern Capital and Acumen could steal commissions from Counter-Plaintiffs under the 2023 APA.

149. Counter-Plaintiffs justifiably relied on Millman's material misrepresentations, concealments, and omissions, to Counter-Plaintiffs' detriment.

150. As a direct and proximate result of the misrepresentations, concealments, and omissions by Millman, Hinkle, Modern Capital, and Acumen, SFG and Capaxa have suffered money damages in an amount to be determined at trial, but believed to be in excess of $20,000,000. This figure includes, but is not limited to: loss of commissions stolen under the 2023 APA; loss of business opportunities with industry players as a result of Millman, Hinkle, Acumen, and Modern Capital's misrepresentations about SFG products causing damage to Counter-Plaintiffs' reputation

in the industry; loss of assets under management fees and investment income as a result of Millman, Hinkle, Acumen and Modern Capital moving policy assets out of the LifeNotes trust without Counter-Plaintiffs' consent; and loss to Counter-Plaintiffs' business valuation as a result of the damage to its reputation.

## COUNT TWO

**Violation of Federal RICO and Conspiracy to Violate Federal RICO,**
**18 U.S.C. § 1964(c) and (d)**
**(Against all Counter-Defendants)**

151. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

152. Counter-Plaintiffs SFG and Capaxa are "person[s]" who have been injured within the meaning of 18 U.S.C. § 1964(c), who bring this claim for civil remedies under RICO, against all Counter-Defendants, each of whom is a "person" within the meaning of 18 U.S.C. § 1961(3).

153. Counter-Defendants formed an association-in-fact for the purpose of defrauding Counter-Plaintiffs and clients. This association-in-fact was an "enterprise" within the meaning of 18 U.S.C. § 1961(4), consisting of Counter-Defendants and others who have yet to be discovered (the "Millman Enterprise"). The Millman Enterprise began with Millman and Modern Capital, who created MAXCAP and began selling products to clients that were fraudulent. On information and belief, Millman subsequently recruited Hinkle to join in his enterprise no later than December 2024, when he and Hinkle began presenting MAXCAP to clients together under their newly formed company, Acumen. Finally, Millman, Hinkle, Modern Capital, and Acumen recruited Baycrest to prepare marketing presentations of MaxCap for potential clients, which included the offering of SFG products without SFG's consent.

154. The Millman Enterprise has been engaged in a continuous scheme to: (1) unlawfully enrich themselves by fraudulently misrepresenting to or concealing from SFG their

62

use of the LIFENOTES MARKS to market and sell SFG products to credit unions and executives and keeping commissions from those sales for themselves; and (2) defrauding clients by marketing and selling products fraudulently held out as LifeNotes plans, advertised with SFG's LIFENOTES MARKS.

155.    Counter-Defendants committed these predicate acts intentionally and knowingly with the specific intent to advance the enterprise.

156.    Counter-Defendants, on multiple occasions and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of the federal wire fraud statute, 18 U.S.C. § 1343. Specifically, and without limitation: (a) between approximately December 2023 and May 2025, Millman, Hinkle, Modern Capital, and Acumen transmitted or caused to be transmitted via electronic mail and electronic document platforms from Massachusetts to clients in multiple states, including Utah, Texas, Colorado, and Indiana, marketing presentations and plan documents falsely representing that clients' plans would enter the Capaxa pool or LifeNotes trust after five years, when in fact SFG had not authorized such representations and the plans would not enter the trust; (b) in or around July 2025, Millman and Acumen transmitted or caused to be transmitted via electronic mail wire instructions directing Client D to wire funds to accounts controlled by Continuation Management LLC, a Florida entity affiliated with Counter-Defendants, rather than to any account associated with the LifeNotes trust, thereby diverting client funds; (c) between approximately April and May 2025, Millman, Hinkle, and Acumen transmitted or caused to be transmitted via electronic mail and electronic document platforms insurance applications and policy exchange documents for the former executive at Client C that falsely represented to

Columbus Life that the Minnesota Life policy was free and clear of title, when in fact it had been assigned to the LifeNotes trust; (d) throughout the relevant period, Millman, Hinkle, Modern Capital, and Acumen transmitted or caused to be transmitted via electronic mail false reports and omissions to Counter-Plaintiffs in Ohio misrepresenting that no new sales of plans had been made, when in fact Millman, Hinkle, Modern Capital, and Acumen had originated and sold numerous new plans and collected commissions thereon; and (e) additional specific instances to be identified through ongoing discovery. Each of these statements was made by or at the direction of Millman, Hinkle, and/or other Counter-Defendants, was false when made, and was made with the specific intent to defraud Counter-Plaintiffs and clients or with reckless disregard for the truth. Counter-Defendants' multiple acts further included misrepresenting their authority to sell and introduce policies into the LifeNotes trust, selling illegitimate SFG products knowing that they were financially unsound and non-compliant with applicable laws and contractual requirements, causing to be executed fraudulent agreements and wire instructions, submitting false insurance applications, misappropriating SFG trademarks and confidential information, and misrepresenting to and concealing from Counter-Plaintiffs sales and commissions owed under the 2023 APA.

157. Each instance of these acts constitutes a separate violation of 18 U.S.C. § 1343.

158. Millman operated at the center of this enterprise, entering into contractual joint marketing arrangements individually and as a principal of Modern Capital in order to gain access to SFG's confidential information and to be able to plausibly exploit SFG's goodwill and reputation in the industry. Millman used businesses that he controlled in order to conduct his operations, including Modern Capital and Acumen.

159. Millman also instructed at least one employee at Acumen to delete references to SFG's products from Acumen's marketing materials that he had presented to clients in an effort to

64

cover up his scheme of misappropriating Counter-Plaintiffs' confidential information and committing trademark infringement.

160.    Hinkle also later joined the scheme, conspiring with Millman to deprive others of their money and property, forming and operating with Millman the entities Acumen Insurance Solutions and Acumen, which had employees in sales, analytical, and other roles in order to further the pretense of legitimacy of Counter-Defendants' business.

161.    Other organizations, including The New Firm Ltd., Continuation Management LLC, Baycrest, and their principals, further expanded the reach of the enterprise's scheme and assisted in papering the frauds by knowingly preparing improper legal documentation and financial accounts.

162.    Counter-Defendants each agreed to further the Millman Enterprise, knowing that the overall objective of the Millman Enterprise was to enrich themselves by marketing and selling financially unsound and non-compliant plans using SFG's trademarks and confidential information, at the expense of clients and Counter-Plaintiffs. Specifically, Millman conceived and directed the scheme and operated Modern Capital to further it, Hinkle joined the scheme and co-operated Acumen with Millman to further it, and Baycrest knowingly assisted in promoting the fraudulent MaxCap scheme to prospective clients. The racketeering activities have directly targeted, among others, SFG, Capaxa, and clients who would have otherwise purchased bona fide plans involving LifeNotes and have thus directly and proximately caused SFG to lose sales.

163.    At all relevant times, the Millman Enterprise was engaged in, and its activities affected, interstate commerce because many of the Counter-Defendants and their clients to whom they sold and marketed fraudulent plans are from different states and used the Internet, email, DocuSign electronic documents, and telephone to conduct the above-described fraudulent

65

enterprise.

164. Counter-Defendants' wrongful conduct in furtherance of this scheme greatly enriched each of the Counter-Defendants and directly and proximately injured Counter-Plaintiffs, depriving them of commissions owed, eroding trust that led to lost business opportunities, damaging their goodwill and reputation, and more. Counter-Plaintiffs are entitled to damages for these injuries. Further, pursuant to 18 U.S.C. § 1964(c), Counter-Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

## COUNT THREE

**Common Law Civil Conspiracy**
**(Against All Counter-Defendants)**

165. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

166. As alleged above, Millman, Hinkle, Modern Capital, Acumen, and Baycrest, and unknown affiliates each agreed with and among one another to defraud Counter-Plaintiffs and clients, infringe SFG's trademarks, engage in unfair competition with Counter-Plaintiffs, commit breaches of the 2022 NDA and 2023 APA, and interfere with Counter-Plaintiffs' contractual relationships and prospective business relations.

167. By the conduct of Millman, Hinkle, Acumen, Modern Capital, Baycrest, and their affiliates, Counter-Plaintiffs have been damaged and are being damaged.

168. Counter-Plaintiffs are entitled to damages against each of the Counter-Defendants, jointly and severally, in an amount to be determined at trial.

## COUNT FOUR

**Federal Trademark Infringement in Violation of Section 32 of the Lanham Act,**
**15 U.S.C. § 1114,**
**(Against Millman, Hinkle, Modern Capital, and Acumen)**

169. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

170. SFG is the owner of all rights, titles, and interests in and to the valid and enforceable LIFENOTES MARKS (as set forth above).

171. Millman, Hinkle, Modern Capital, and Acumen, without authorization, have marketed and sold in interstate commerce financial products featuring the identical trademarks CAPAXA and LIFENOTES. Millman, Hinkle, Modern Capital, and Acumen are selling identical and overlapping products under the LIFENOTES MARKS to those of Counter-Plaintiffs, targeting the exact same consumers using the same channels of trade. Such actions are likely to cause, and have caused, confusion, mistake, and deception as to the source of origin, sponsorship, or approval of Millman, Hinkle, Modern Capital, and Acumen's products that purport to or imply to be implemented using the LifeNotes trust. Consumers and potential consumers in this judicial district and elsewhere in the United States are likely to believe SFG authorizes and controls the sale of Millman, Hinkle, Modern Capital, and Acumen's fraudulent products, or that Millman, Hinkle, Modern Capital, and Acumen are associated with or authorized by SFG to sell fraudulent LIFENOTES and/or CAPAXA plans in the United States.

172. Millman, Hinkle, Modern Capital, and Acumen's acts have injured or are likely to injure SFG's image and reputation with consumers in this judicial district and elsewhere in the United States by creating confusion about, and/or dissatisfaction with CAPAXA and LIFENOTES products.

173. Millman, Hinkle, Modern Capital, and Acumen's acts have injured or are likely to

injure SFG's image and reputation with consumers in this judicial district and elsewhere in the United States by causing customer dissatisfaction, insurance carrier dissatisfaction, a diminution of the value of the goodwill associated with the LIFENOTES MARKS, and a loss of sales and/or market share to SFG's competition.

174. On information and belief, consumers have confused the MAXCAP product with CAPAXA and LIFENOTES because Millman, Hinkle, Modern Capital, and Acumen made false and misleading statements in the context of marketing and advertising MAXCAP through presentations to potential clients and on Acumen's website. Millman, Hinkle, Modern Capital, and Acumen are selling identical and overlapping products under the LIFENOTES MARKS to those of Counter-Plaintiffs, targeting the exact same consumers using the same channels of trade. On information and belief, Millman, Hinkle, Modern Capital, and Acumen's claims are material to consumers' purchasing decisions. On information and belief, Millman, Hinkle, Modern Capital, and Acumen would not have included such statements in their marketing and advertising if they did not believe they would influence the consumer's decision to purchase.

175. Millman, Hinkle, Modern Capital, and Acumen's acts have been committed deliberately and willfully, with knowledge of SFG's exclusive rights and goodwill in the LIFENOTES MARKS, and with knowledge of the infringing nature of the marks when used in connection with the fraudulent LIFENOTES plans they purport to sell. Millman, Hinkle, Modern Capital, and Acumen's acts have also been committed in bad faith and with the intent to cause confusion, or to cause mistake and/or to deceive.

176. As a result of Millman, Hinkle, Modern Capital, and Acumen's trademark infringement, SFG has suffered and will continue to suffer substantial and irreparable injury, loss, and damage to its rights in and to the LIFENOTES MARKS, and damage to the goodwill

associated therewith, for which it has no adequate remedy at law.

177. Millman, Hinkle, Modern Capital, and Acumen's claims are likely to deceive consumers into believing that the products they are selling are, in fact, unique to Millman, Hinkle, Modern Capital, and Acumen, when that is not the case and when, in fact, LIFENOTES is the original intellectual property of SFG.

178. If not restrained, Millman, Hinkle, Modern Capital, and Acumen will have unfairly derived and will continue to derive income, profits, and business opportunities resulting from their acts of infringement.

179. As the acts alleged herein constitute infringement of the LIFENOTES MARKS under 15 U.S.C. § 1114, and as SFG has no adequate remedy at law, SFG is entitled to injunctive relief, as well as to Millman, Hinkle, Modern Capital, and Acumen's profits, SFG's damages, and other remedies provided by 15 U.S.C. §§ 1116, 1117 and 1118, and to reasonable attorneys' fees and prejudgment interest pursuant to 15 U.S.C. § 1117.

## COUNT FIVE

**Federal Unfair Competition and False Advertising**
**in Violation of the Lanham Act § 43(a), 15 U.S.C. §§ 1125(a)(1)(A) and (B),**
**(Against Millman, Hinkle, Modern Capital, and Acumen)**

180. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

181. Millman, Hinkle, Modern Capital, and Acumen, without authorization, have marketed and sold in interstate commerce financial products featuring the LIFENOTES MARKS. On information and belief, consumers have confused the MAXCAP product with CAPAXA and LIFENOTES because Millman, Hinkle, Modern Capital, and Acumen made false and misleading statements in the context of marketing and advertising MAXCAP through presentations to potential clients and on Acumen's website. Millman, Hinkle, Modern Capital, and Acumen are

69

selling identical and overlapping products under the LIFENOTES MARKS to those of Counter-Plaintiffs, targeting the exact same consumers using the same channels of trade. Such actions are likely to cause, and have caused, confusion, mistake, and deception as to the source of origin, sponsorship, or approval of Millman, Hinkle, Modern Capital, and Acumen's products that purport to or imply to be implemented using the LifeNotes trust. Clients and potential clients in this judicial district and elsewhere in the United States are likely to believe SFG authorizes and controls the sale of Millman, Hinkle, Modern Capital, and Acumen's fraudulent products, or that Millman, Hinkle, Modern Capital, and Acumen are associated with or authorized by SFG to sell its fraudulent LifeNotes plans in the United States.

182. Millman, Hinkle, Modern Capital, and Acumen's conduct set forth herein constitutes a false representation and a false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A). Millman, Hinkle, Modern Capital, and Acumen made false or misleading statements of fact in connection with the marketing and sale of their MAXCAP product by representing to clients that their policies would enter the LifeNotes trust after five years; by representing to clients that Millman, Hinkle, Modern Capital, and Acumen were authorized by SFG to sell such products; and by representing to clients that the plans would deliver the same benefits as bona fide LifeNotes plans, when none of these representations was true.

183. Millman, Hinkle, Modern Capital, and Acumen's conduct set forth herein also constitutes false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

184. Millman, Hinkle, Modern Capital, and Acumen's false and misleading statements were material to and likely influenced the purchasing decisions of the intended audience. On information and belief, at least seventeen credit unions purchased Millman, Hinkle, Modern

70

Capital, and Acumen's MaxCap product based on these misrepresentations.

185. Millman, Hinkle, Modern Capital, and Acumen's acts have been committed with knowledge of SFG's exclusive common law rights and goodwill in the LIFENOTES MARKS, as well as with bad faith and the intent to cause confusion or mistake, and/or to deceive.

186. As a result of Millman, Hinkle, Modern Capital, and Acumen's trademark infringement, SFG has suffered and will continue to suffer substantial and irreparable injury, loss, and damage to its rights in and to the LIFENOTES MARKS, and damage to the goodwill associated therewith, for which it has no adequate remedy at law.

187. Additionally, Millman, Hinkle, Modern Capital, and Acumen's misrepresentations injured SFG by causing clients to purchase Counter-Defendants' unauthorized products rather than bona fide SFG products, directly resulting in lost sales and diverted commissions.

188. If not restrained, Millman, Hinkle, Modern Capital, and Acumen will have unfairly derived and will continue to derive income, profits, and business opportunities resulting from their acts of infringement.

189. As the acts alleged herein violate Section 43(a) of the Lanham Act, and as SFG has no adequate remedy at law, SFG is entitled to injunctive relief as well as to Counter-Defendants' profits, SFG's damages, and other remedies provided by 15 U.S.C. §§ 1116, 1117 and 1118, and to reasonable attorneys' fees and prejudgment interest pursuant to 15 U.S.C. § 1117.

## COUNT SIX

### Violation of Common Law Trademark Rights
### (Against Millman, Hinkle, Modern Capital, and Acumen)

190. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

191. As described above, SFG owns common law rights in the LIFENOTES MARKS.

71

192.    SFG's ownership and exclusive use in commerce of the LIFENOTES MARKS, including in Ohio, is superior to and predates any use of the LIFENOTES MARKS by Millman, Hinkle, Modern Capital, and Acumen.

193.    Millman, Hinkle, Modern Capital, and Acumen's use of the LIFENOTES MARKS as a trademark in commerce in connection with a life insurance third-party trust marketing scheme and its product, MAXCAP, as described above, is without SFG's consent and is likely to cause confusion, to cause mistake, and to deceive as to the origin or source of Millman, Hinkle, Modern Capital, and Acumen's product, and/or to cause consumers to believe, mistakenly, that Millman, Hinkle, Modern Capital, and Acumen and/or their products are part of, or sponsored, licensed, endorsed, or approved by, or otherwise affiliated with, SFG.

194.    Millman, Hinkle, Modern Capital, and Acumen's unlawful activities constitute trademark infringement and unfair competition in violation of the common law of the State of Ohio.

195.    As a direct and proximate result of Millman, Hinkle, Modern Capital, and Acumen's willful trademark infringement and unfair competition, SFG has been and will continue to be damaged.

196.    On information and belief, Millman, Hinkle, Modern Capital, and Acumen have realized, and continue to realize, revenue, profits, and other benefits as a result of their unlawful actions to the detriment of SFG.

197.    Millman, Hinkle, Modern Capital, and Acumen's conduct is causing and, unless Millman, Hinkle, Modern Capital, and Acumen are restrained, will continue to cause SFG to suffer irreparable injury for which SFG has no adequate remedy at law.

## COUNT SEVEN

### Deceptive Trade Practices in Violation of Ohio Rev. Code § 4165.02
### (Against all Counter-Defendants)

198. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

199. SFG owns trademark rights in the LIFENOTES MARKS, and Counter-Defendants' acts, as described above, constitute deceptive trade practices in violation of the Ohio Deceptive Trade Practices Act, codified at Ohio Revised Code § 4165.02.

200. Counter-Defendants' unlawful use of SFG's trademarks and/or colorable imitations thereof creates a likelihood of confusion among consumers with respect to at least the source, sponsorship, or approval of the parties' goods or services or as to the affiliation, connection, or association between the parties and/or the parties' goods or services.

201. In the course of marketing its MAXCAP product to clients and on Counter-Defendants Acumen and Baycrest's websites, Counter-Defendants create a likelihood of confusion or misunderstanding as to at least the affiliation, connection, and/or association between the parties and/or the parties' goods or services. Counter-Defendants Millman, Hinkle, Acumen, and Modern Capital's deceptive trade practices actually deceived, or had the tendency to deceive, a substantial segment of potential consumers, as evidenced by the at least 17 credit unions and executives who, on information and belief, purchased Counter-Defendants' MaxCap product in reliance on Counter-Defendants' false representations regarding the LifeNotes trust and Capaxa. Counter-Defendants' misrepresentations were material to consumers' purchasing decisions, as the purported ability to enter the LifeNotes trust was a central and distinguishing feature of the product Counter-Defendants marketed.

202. Counter-Defendants' conduct is and has been deliberate, intentional, and willful

73

and has been committed with full knowledge of Counter-Plaintiffs' rights. Counter-Defendants' bad faith is evidenced by at least Counter-Defendants' ongoing and expanding campaign to copy Counter-Plaintiffs, confuse consumers, and erode Counter-Plaintiffs' trademark rights.

203.    Counter-Plaintiffs have been injured as a result of Counter-Defendants' unlawful and unauthorized deceptive trade practices by damaging Counter-Plaintiffs' goodwill with the public.

204.    As a result of Counter-Defendants' unlawful and unauthorized deceptive trade practices, Counter-Defendants have caused and will continue to cause substantial and irreparable harm to Counter-Plaintiffs and to the public for which there is no adequate remedy at law. Counter-Defendants have unjustifiably benefited from their unlawful acts and will continue to do so unless enjoined by this Court.

205.    Counter-Plaintiffs are entitled to injunctive relief and to recover reasonable attorneys' fees under at least Ohio Revised Code § 4165.03.

## COUNT EIGHT

### Unfair Competition in Violation of Mass. G.L. c. 93A
### (Against All Counter-Defendants)

206.    Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

207.    Counter-Defendants are persons engaged in the conduct of trade or commerce within the meaning of Mass. G.L. c. 93A, § 11. Millman, Modern Capital, and Acumen are each residents of Massachusetts and conduct business nationwide, including significant business within Massachusetts. On information and belief, Millman, Modern Capital, and Acumen have targeted at least four non-profit institutions and two individuals in Massachusetts in the course of their fraudulent business activities.

74

208.    The unlawful acts, conduct, and practices by Counter-Defendants described above, particularly with respect to those actions aimed at Massachusetts clients, occurred and are occurring primarily and substantially within the Commonwealth of Massachusetts.  Millman, Modern Capital, and Acumen and on information and belief, other individuals responsible for the deceptive scheme to steal commissions owed to Counter-Plaintiffs, use Counter-Plaintiffs' confidential information in an unauthorized manner to solicit clients, and use SFG's trademarks to attract clients without Counter-Plaintiffs' permission, are and were, at all relevant times, located in and conducted business from Massachusetts.

209.    The acts, conduct, and practices by Counter-Defendants described above include without limitation falsely and/or misleadingly marketing SFG's products without authorization and misrepresenting sales to Counter-Plaintiffs, and attempting to free-ride on the substantial goodwill in the LifeNotes trust, originated in Massachusetts, concern services offered and/or goods sold in Massachusetts, and advertising done in Massachusetts, and constitute unfair methods of competition and/or unfair or deceptive acts or practices, which are unlawful under Mass. G.L. c.93A.

210.    As detailed herein, Counter-Defendants engaged in a pattern of conduct, with an improper motive, aimed at injuring Counter-Plaintiffs' right to receive the fruits of the Advisor Producer Agreement, in disregard of known contractual arrangements, and with the intent to secure commercial benefits for Counter-Defendants.

211.    Counter-Defendants' unfair and deceptive conduct included soliciting confidential information regarding the LifeNotes trust and assuring Counter-Plaintiffs that confidential information would be used to market SFG's products in accordance with the Advisor Producer Agreement.  Counter-Defendants' unfair and deceptive conduct also included using the

75

information provided to Counter-Defendants for Counter-Defendants' own gain, knowing full well Counter-Defendants never intended to properly split the commissions that resulted from making policy sales as a result of marketing SFG products. Additionally, Counter-Defendants' unfair and deceptive conduct included their misrepresentations to potential clients and existing clients that Counter-Defendants were affiliated with Counter-Plaintiffs, and that Counter-Defendants had authorization to sell products that purported to move assets into the LifeNotes trust.

212. Counter-Defendants engaged in this pattern of unfair and deceptive conduct knowingly and willfully.

213. As a direct and proximate result of Counter-Defendants' violations of Mass. G.L. c. 93A, Counter-Plaintiffs have suffered a loss of money or property, including but not limited to: lost commissions that Counter-Defendants concealed and diverted in violation of the 2023 APA; lost business opportunities resulting from Counter-Defendants' damage to Counter-Plaintiffs' reputation and goodwill; costs incurred in investigating and remediating Counter-Defendants' fraudulent conduct; and diminution in the value of the LIFENOTES MARKS and associated goodwill. These losses were directly and proximately caused by Counter-Defendants' unfair and deceptive acts and practices, including their fraudulent misrepresentations to clients, their unauthorized use of SFG's trademarks and confidential information, and their concealment of sales and commissions from Counter-Plaintiffs. Counter-Plaintiffs will continue to be damaged.

### COUNT NINE

**Breach of the 2023 APA and the Implied Covenant of Good Faith and Fair Dealing**
**(Against Millman, Hinkle, Modern Capital, and Acumen)**

214. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

215. The 2023 APA between Counter-Plaintiffs and Millman, Hinkle, Acumen, and

76

Modern Capital is a valid and enforceable contract.

216. Counter-Plaintiffs performed their obligations under the 2023 APA.

217. Millman, Hinkle, Acumen, and Modern Capital breached the 2023 APA by, among other things, failing to disclose sales of new plans; failing to share commissions from all Business Opportunities in the Market resulting from their use of SFG and Capaxa's materials and support; misappropriating SFG products; selling purported SFG products to executives and organizations without Counter-Plaintiffs' knowledge and consent; engaging in Business Opportunities with prospective clients within twelve months of termination of the agreement; and improperly using or disclosing Counter-Plaintiffs' nonpublic information or Confidential Information.

218. Millman, Hinkle, Acumen, and Modern Capital also breached the implied covenant of good faith and fair dealing inherent in the 2023 APA, by, among other things, (a) creating and executing a scheme to sell plans leveraging SFG's confidential information and materials, the LifeNotes Marks, and Counter-Plaintiffs' name and reputation, while circumventing their obligations under the 2023 APA; (b) misrepresenting to Counter-Plaintiffs that no new sales of plans had been made when in fact they had; (c) instructing employees to destroy or alter sales and marketing documents in order to conceal breaches; (d) manipulating assets already assigned to the LifeNotes trust by exchanging underlying policies without the trust's consent; and (e) utilizing confidential plan design materials in a manner unauthorized by the 2023 APA and for Millman, Hinkle, Acumen, and Modern Capital's own personal gain at the expense of Counter-Plaintiffs.

219. These unanticipated actions were undertaken in bad faith and fundamentally undercut the purpose of the 2023 APA, which was to establish a cooperative joint marketing arrangement in which both parties would share the benefits of marketing SFG products.

220. As a result of Millman, Hinkle, Acumen, and Modern Capital's breaches of the

2023 APA, Counter-Plaintiffs have been injured and are entitled to all damages available under the law, including (without limitation) interest and attorneys' fees.

## COUNT TEN

**Breach of the 2022 NDA and the Implied Covenant of Good Faith and Fair Dealing
(Against Millman, Hinkle, Modern Capital, and Acumen)**

221.     Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

222.     The 2022 NDA between Counter-Plaintiffs and Millman, Hinkle, Acumen, and Modern Capital as described herein is a valid and enforceable contract.

223.     Counter-Plaintiffs performed their obligations under the 2022 NDA.

224.     Millman, Hinkle, Acumen, and Modern Capital breached the 2022 NDA by, among other things, improperly using and disclosing Counter-Plaintiffs' Confidential Information for purposes unrelated to the joint pursuit of Business Opportunities; failing to safeguard Counter-Plaintiffs' Confidential Information with the required degree of care; failing to ensure that the individuals acting on their behalf abided by the nondisclosure obligations imposed by the 2022 NDA; and engaging in numerous Business Opportunities with numerous prospective clients within 36 months of the termination of the 2022 NDA, in which they used Counter-Plaintiffs' proprietary information and materials.

225.     Millman, Hinkle, Acumen, and Modern Capital also breached the implied covenant of good faith and fair dealing inherent in the 2022 NDA. Millman, Hinkle, Modern Capital, and Acumen, among other things, misappropriated SFG's confidential information, including client lists and confidential plan designs, in a manner unauthorized by the 2022 NDA and for Millman, Hinkle, Acumen, and Modern Capital's personal gain at the expense of Counter-Plaintiffs.

78

226. These unanticipated actions were undertaken in bad faith and fundamentally undercut the purpose of the 2022 NDA, which was to facilitate the exchange of confidential information for the parties' mutual benefit in pursuing joint Business Opportunities in furtherance of the 2023 APA.

227. As a result of Millman, Hinkle, Acumen, and Modern Capital's breaches of the 2022 NDA, Counter-Plaintiffs have been injured and are entitled to all damages available under the law, including, but not limited to, interest and attorneys' fees.

## COUNT ELEVEN

### Unjust Enrichment
### (Against All Counter-Defendants)

228. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

229. The acts of Counter-Defendants complained of herein constitute unjust enrichment of the Counter-Defendants at the expense of Counter-Plaintiffs in violation of the common law of Ohio. Counter-Defendants misappropriated and leveraged Counter-Plaintiffs' marketing materials, confidential information, LIFENOTES MARKS, name and reputation, and received a benefit from doing so without splitting commissions with Counter-Plaintiffs.

230. Counter-Defendants had an appreciation and knowledge of the benefit they derived from, among other things, their unauthorized use of Counter-Plaintiffs' materials, information, name, trademarks, and reputation; and, from their failing to split commissions with Counter-Plaintiffs, and from Counter-Plaintiffs' resources, reputation, and business relationships.

231. Counter-Plaintiffs incurred the costs associated with, among other things, developing their name and reputation; preparing marketing materials and proprietary information; and expending time and effort without receiving due payment for those efforts or services.

79

Moreover, Counter-Defendants have wrongfully retained, diverted, misappropriated, or failed to return money, commissions, customer payments, leads, or property that rightfully belong to Counter-Plaintiffs.

232. Retention by the Counter-Defendants of the benefits they derived from their malfeasance would be inequitable.

233. Counter-Plaintiffs seek injunctive relief and compensatory damages in an amount to be proven at trial, including without limitation disgorgement of Counter-Defendants' ill-gotten gains.

234. As a direct result of Counter-Defendants' actions, Counter-Plaintiffs suffered and continue to suffer irreparable harm for which no adequate remedy at law exists, and which will continue unless Counter-Defendants' actions are enjoined.

## COUNT TWELVE

**Tortious Interference with Business Expectancy**
**(Against Millman, Modern Capital, Hinkle, and Acumen)**

235. Counter-Plaintiffs incorporate by reference the preceding paragraphs of these counterclaims as though fully set forth herein.

236. Counter-Plaintiffs had existing and anticipated economic relationships with each of their existing and prospective clients. Each of those relationships benefited Counter-Plaintiffs economically and was expected to do so in the future.

237. Millman, Modern Capital, Hinkle, and Acumen had actual knowledge of the existence of these business relationships. Further, under the terms of the 2023 APA, Millman, Modern Capital, Hinkle, and Acumen were obligated to treat each prospective client they approached with SFG products as a joint client with Counter-Plaintiffs.

238. Millman, Modern Capital, Hinkle, and Acumen interfered with these business

relationships by, among other things, falsely convincing clients that in order to benefit from the LifeNotes trust, they did not need to assign their plans to the trust at the outset and they could buy new plans and move them in to the LifeNotes trust at some point in the future; and by using Counter-Plaintiffs' name and reputation to sell clients products that would not work as clients intended and were led to believe.

239. Millman, Modern Capital, Hinkle, and Acumen's interference was intentional, arose from an improper motive and by improper means, and was without legal justification or privilege, and undertaken with the purpose and substantial certainty of causing, and which in fact did cause, third parties to not enter into or not continue the prospective business relationship with Counter-Plaintiffs, and prevented Counter-Plaintiffs from acquiring or continuing the prospective business relationships with third parties.

240. Millman, Modern Capital, Hinkle, and Acumen's intentional and wrongful conduct has caused immediate, substantial, and ongoing injury to Counter-Plaintiffs, including substantial economic harm in the form of damage to their relationships with existing and prospective clients, lost profits, increased costs, lost business opportunities, consequential damages, damage to their goodwill and reputation, confusion in the marketplace, and other foreseeable losses arising from the disruption of Counter-Plaintiffs' business relationships with existing and prospective clients.

241. This conduct was willful, malicious, oppressive, fraudulent, or in conscious disregard of Counter-Plaintiffs' rights, entitling Counter-Plaintiffs to an award of punitive or exemplary damages to the extent permitted by Ohio law.

242. Counter-Plaintiffs are entitled to recover pre- and post-judgment interest, costs of suit, and, to the extent permitted by law or contract, reasonable attorneys' fees incurred in prosecuting this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Counter-Plaintiffs respectfully demand judgment in their favor against Counter-Defendants as follows:

A.       That judgment be entered in favor of Counter-Plaintiffs and against Counter-Defendants on Counts One through Twelve of these counterclaims;

B.       Permanently enjoining Counter-Defendants, their agents, servants, employees, attorneys, successors, and assigns, and all others in active concert or participation with them, from falsely or misleadingly advertising or promoting split-dollar plans that falsely describing entry into the LifeNotes trust or Capaxa pool;

C.       Ordering Counter-Defendants to destroy all deceptive advertising materials and undertake corrective measures to rectify any erroneous impression clients may have derived concerning the involvement of the LIFENOTES MARKS in the operation of Acumen's business;

D.       Ordering Counter-Defendants to pay back all amounts unjustly retained;

E.       Awarding Counter-Plaintiffs damages suffered because of losses caused by Counter-Defendants' practices, including but not limited to costs of corrective advertising, and/or restitution or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Counter-Defendants as a result of their unlawful, unfair, and/or fraudulent business acts or practices, as well as any punitive and enhanced damages this Court sees fit to grant;

F.       Awarding Counter-Plaintiffs their reasonable costs and attorneys' fees, pre-judgment interest, and post-judgment interest, in amounts to be determined by the Court; and

G.       Granting such other and further relief as the Court deems just and proper.

82

## JURY DEMAND

Counter-Plaintiffs hereby demand a trial by jury on all claims, counterclaims, defenses, and issues in this action so triable.


Dated: April 1, 2026                                    Respectfully submitted,


                                                        /s/ Michael R. Reed
                                                        Michael R. Reed (Trial Attorney) (0063995)
                                                        Hahn Loeser & Parks, LLP
                                                        65 East State Street, Suite 2500
                                                        Columbus, Ohio 43215
                                                        T: 614.233.5165
                                                        F: 614.221.5909
                                                        mreed@hahnlaw.com

                                                        *Counsel for Defendants and Counter-Plaintiffs Infineo Holdings, Inc., SFG Executive Benefits, LLC d/b/a Stearns Financial Group, LLC, and Capaxa, LLC*

*Of Counsel:*

/s/ Luke T. Cadigan
_____

Luke T. Cadigan *(pro hac vice)*
Y. Jane Zhou *(pro hac vice)*
Emma R. LoMastro *(pro hac vice)*
Cooley LLP
500 Boylston St., 14th Floor
Boston, MA 02116-3736
T: 617.937.2467
F: 617.937.2400
lcadigan@cooley.com
jane.zhou@cooley.com
elomastro@cooley.com

*Counsel for Defendants and Counter-Plaintiffs Infineo*
*Holdings, Inc., SFG Executive Benefits, LLC d/b/a*
*Stearns Financial Group, LLC, and Capaxa, LLC*

## CERTIFICATE OF SERVICE

The foregoing was filed electronically on April 1, 2026. Notice of this filing will be sent by operation of the Court's Electronic Filing System. Parties may access this filing through the Court's filing system.

/s/ Michael R. Reed
Michael R. Reed